STATE OF MISSOURI, on the Information of JOHN M. DALTON, Attorney-General, Relator, v. MILES LABORATORIES, INC., MCKESSON AND ROBBINS, INC., MCPIKE DRUG COMPANY, a Corporation, MCPIKE, INC., C. D. SMITH DRUG COMPANY, a Corporation, ST. LOUIS WHOLESALE DRUG COMPANY, a Corporation, and MEYER BROS. DRUG COMPANY, a Corporation, Respondents, No. 42152—282 S. W. (2d) 564.

Court en Banc, October 10, 1955.

*John M. Dalton,* Attorney General, and *Robert R. Welborn,* Assistant Attorney General, for relator.

352

*James M. Douglas* and *Thompson, Mitchell, Thompson & Douglas* for McKesson and Robbins, Inc., St. Louis Wholesale Drug Company and Meyer Brothers Drug Company; *Kenneth E. Midgley* and *Blackmar, Newkirk, Eager, Swanson & Midgley* for McPike Drug Company; *Robert A. Brown, Jr.,* and *Brown, Douglas & Brown* for C. D. Smith Drug Company.

*Verne G. Cawley, James C. Wilson* and *Colvin A. Peterson, Jr.,* for respondent Miles Laboratories, Inc.; *Cawley, Happer, Slabaugh & Byron* and *Watson, Ess, Whittaker, Marshall & Enggas* of counsel.

[566] STONE, Special Judge.—This original proceeding in quo warranto was instituted by the filing on June 29, 1950, of an information charging seven corporate respondents with violations of the Missouri anti-trust statutes. Sections 416.010 to 416.040, incl. (All statutory references herein are to RSMo 1949, V.A.M.S.) After the

filing of separate answers by respondents, an order was entered on [567] November 13, 1950, appointing Lyman Field, Esq., as special commissioner to take evidence upon the issues joined and to report the evidence thus taken, together with his findings of fact and conclusions of law. Following extended hearings, our commissioner filed his report on September 8, 1953, in which he concluded that none of the respondents had violated the Missouri anti-trust statutes as charged in the information. The Attorney-General (hereinafter referred to as relator) excepts to the commissioner's findings and conclusions only as to Miles Laboratories, Inc. (hereinafter referred to as Miles).

Miles is an Indiana corporation duly registered and qualified to do business in Missouri, which manufactures and sells throughout the United States several brand-name proprietary medicines. However, the evidence was confined, almost entirely, to distribution and sale of a single product, Alka-Seltzer, which, during the period under consideration, i.e., three years prior to June 29, 1950,[1] was distributed by Miles in Missouri in three ways, to-wit, (1) by sales to retailers through nine drug wholesalers (including the other six respondents in this case, hereinafter referred to as the other respondents), who were appointed by Miles as del credere factors, (2) by direct sales to approximately one hundred thirty other wholesalers in Missouri, and (3) by direct sales to approximately seventy-five large retailers, including Katz Drug Company, operating a chain of drug stores in Kansas City and elsewhere, and (prior to May, 1949) Milgram Food Stores, Inc., operating a chain of grocery supermarkets in Kansas City. With each of the nine drug wholesalers in Missouri (as well as drug wholesalers throughout the nation) who were appointed as del credere factors, Miles entered into a written consignment agreement providing, among other things, that Miles would furnish a consigned stock of its products to the factor, that Miles reserved the right to designate the purchasers from whom the factor should or should not solicit orders for the consigned Miles products and reserved absolute title to such products until delivery to the purchasers thereof, that the factor would fill orders only at stated prices and discounts and would remit promptly to Miles the proceeds of sales of Miles products less the factor's commission, and that the factor would "not enter into any contract under the fair trade laws or otherwise suggest the prices at which any purchaser of said products shall resell the same." Noting that relator had conceded his inability to find any Missouri case indicating that such consignment agreements violate our anti-trust statutes, and pointing out that the

---

[1]Section 516.360, the three-year statute of limitations, is applicable in proceedings under the Missouri anti-trust statutes. State ex inf. Attorney General v. Arkansas Lumber Co., 260 Mo. 212, 283-285, 169 S.W. 145, 167-168(9).

relationship between Miles and its factors was that of principal and agent [State ex rel. Parker v. Thompson, 120 Mo. 12, 20, 25 S.W. 346, 348] and that the factors' guaranty of payment for Miles products sold through them did not affect that relationship [Suman v. Inman, 6 Mo. App. 384], our commissioner properly concluded that the evidence as to the other respondents, limited as it was to proof of execution of the consignment agreements and dealings in strict accordance therewith, was wholly insufficient to justify a finding against those respondents.

■ We turn to the issue as to Miles. The information closely . follows the language of Sections 416.010 to 416.040, incl.,[2] and [568] in general terms charges violations of each of those statutes. However, the gravamen of relator's charge is that Miles was guilty of so-called *vertical* price-fixing, i.e., the fixing and maintenance of resale prices; and, the determinative questions here are (1) whether Miles entered into any arrangement, agreement or understanding to fix or maintain the resale price of Alka-Seltzer or to lessen full and free competition in the sale thereof and (2) if so, whether such action violated the Missouri anti-trust statutes. Having found that "no price-fixing agreements were shown or proved by the evidence," our commissioner deemed it unnecessary to rule the second question. Although a commissioner's findings may be persuasive [State ex inf. Barker v. Armour Packing Co., 265 Mo. 121, 144, 176 S.W. 382, 387], "(t)he case is here for our weighing upon the law, and for our examination upon the evidence, as we may find it to be from the record" [State ex

[2]Section 416.010 provides that "Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition in the * * purchase or sale of * * * any article or thing bought or sold whatsoever, shall be deemed and adjudged guilty of a conspiracy in restraint of trade * * *."

Section 416.020 provides that "Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any other person or persons to regulate, control or fix the price of * * * any article or thing whatsoever, of any class or kind bought or sold, * * * or to maintain said price when so regulated or fixed, * * * * * shall be deemed and adjudged guilty of a conspiracy in restraint of trade * * *."

Section 416.040 provides that "All arrangements, contracts, agreements, combinations or understandings made or entered into between any two or more persons, designed or made with a view to lessen, or which tend to lessen, lawful trade, or full and free competition in the * * sale in this state of any * * article, or thing bought and sold, of any class or kind whatsoever, * * * and all arrangements, contracts, agreements, combinations or understandings made or · entered into between any two or more persons which are designed or made with a view to increase, or which tend to increase, the market price of any * * article or thing, of any class or kind whatsoever bought and sold, * * * are hereby declared to be against public policy, unlawful and void; and any person or persons creating, entering into, becoming a member of or participating in such arrangements, contracts, agreements, combinations or understandings shall be deemed and adjudged guilty of a conspiracy in restraint of trade * * *."

inf. Attorney General v. Arkansas Lumber Co., 260 Mo. 212, 274-275, 169 S.W. 145, 164-165] and the ultimate responsibility for determination of both issues of fact and questions of law rests upon us.

As readily acknowledged by its President, Mr. Walter R. Beardsley, Miles has ''strongly advocated'' and supported fair trade legislation throughout the nation and has been a leader in procuring enactment of such legislation in forty-five states, Missouri being one of only three states which does not have a fair trade act. (The other two are Texas and Vermont.) Since 1934, Miles has followed consistently the policy of refusing to sell Alka-Seltzer to those who do not maintain the suggested minimum retail prices of 49c for the ''60c size'' and 24c for the ''30c size.'' Lists showing Miles' suggested minimum retail prices for all of its products have been published and distributed to both wholesalers and retailers, and its salesmen, such as Jacob Raca, Jr., who traveled the northern half of Missouri (including Kansas City) during the period under consideration here, have been instructed to check advertised and ''shelf'' prices on Miles products and to report any ''price violations'' to their superiors promptly. It is apparent from the record that Miles' price maintenance policy has become well known in the drug industry. As stated by Mr. Morris R. Shlensky, Executive Vice-President and General Manager of Katz, Miles is one of the ''very few'' drug suppliers ''who are sincere about * * adherence to suggested minimum prices'' and ''are really severe in their policing of their (price) policy.''

Shortly after Milgram began to handle drug items about 1940, a sales representative of Miles, Stair by name, called on John W. Mabry, then manager of Milgram's drug department, and ''talked about their suggested price.'' Mabry told Stair that ''we will try to go along'' with Miles' price maintenance policy and, as Mabry construed it, he ''made a promise'' that ''we would get their (Miles) suggested prices.'' So long as Mabry continued as manager of its drug department, Milgram did maintain Miles' suggested minimum retail prices, except for one brief reduction (subsequently [569] discussed with a Miles representative) to meet a price advertised by a local competitor who ''made a mistake.'' When Mabry was transferred to another department and Sheldon Levine became manager of Milgram's drug department about 1946, Mabry told Levine (to use Mabry's language) ''that I agreed to kind of go along with their (Miles) policy of suggested retail prices'' or (to use Levine's language) ''that he (Mabry) had agreed to maintain that price with Miles''; and, Miles' suggested minimum retail prices were respected and maintained until March, 1949, when Levine ''thought it was good business'' to cut the price of Alka-Seltzer and advertised the ''60c size'' first for 39c and later for 35c.

In May, 1949, Maurice Blond, Katz' merchandise manager, called Perry L. Shupert, Miles' sales manager, at Miles' home office in Elk-

hart, Indiana, and told Shupert that Katz "no longer could ignore" Milgram's advertised prices on Alka-Seltzer and intended to meet competition. Shupert "requested that we do nothing about meeting competitive situations." Within a few days, Kendall McKee, Miles' division sales manager from Chicago, and Raca, Miles' local repre- sentative, conferred personally with Katz' Shlensky and Blond, who again urged that "we should be allowed to go along and meet the competitive situation'' created by Milgram's advertised prices. McKee "requested that we not go ahead"; and, after Katz' Shlensky had talked over long distance with Beardsley, Miles' president, Katz de- cided to maintain Miles' suggested prices on Alka-Seltzer for the time being.

Levine, Milgram's drug manager, having refused Shupert's tele- phonic request and McKee's personal request to raise Milgram's retail price on Alka-Seltzer to Miles' suggested minimum, Miles' Shupert wrote Raca, Miles' local representative, on May 13, 1949, that Levine had been notified "that we would refuse to sell him any more merchan- dise," and that "We will write all wholesalers in the area which services all of their outlets, advising them not to accept any orders for merchandise.[3] In the meantime, you will have to do a thorough job of policing your wholesalers in the Kansas City area to determine whether or not any of these tobacco, candy or grocery jobbers sell Mil- gram any of our products." Shupert also asked Raca over long dis- tance to "see if I (Raca) can find out where he (Milgram's Levine) is getting any Alka-Seltzer and they can cut him off." In response to Shupert's requests for "a thorough job of policing * wholesalers" (*not* confined to factors), Raca said that he called on seven wholesalers (only three of whom were factors) and told each, in susbstance, that Miles "was having trouble with Milgram over the price violation" as to Alka-Seltzer and "we would like to have them cooperate with us and not to sell" any Miles products to Milgram. According to Raca, each wholesaler's representative said that "he would try to cooperate with us." The only such representative who testified, G. E. Stockton of Gib- son Products Company (*not* a factor), stated that he had told Raca that "I would work with him," although admitting on cross-examina- tion à secret intention to sell Miles products to Milgram whenever he could.

After the early part of May, 1949, Milgram's orders to Miles' home office were not filled, but Milgram subsequently obtained Alka-Seltzer

---

[3]Perhaps significantly, Shupert did not testify; but, John A. Cawley, Miles' Assistant Secretary "in charge of all of the fair trade problems of the company." denied that "all wholesalers in the area" had been written but produced a copy of a letter addressed on May 16, 1949, to thirty-six drug wholesalers in Missouri. Kansas, Nebraska. Iowa and Illinois. who had been appointed as del credere factors, in which Miles requested "your cooneration, until otherwise notified, by refusing to sell" any Miles products to Milgram.

by purchase from the Plattner Company, a Kansas City wholesaler, pursuant (as Levine averred but Raca denied) to arrangement made by Raca contrary to his employer's direction. In any event, Milgram continued to advertise Alka-Seltzer at prices below those "suggested" by Miles, so Katz' Shlensky again complained [570] to Miles' Shupert. By letter dated June 2, 1949, Shupert told Raca of a long distance telephone call "just received" from Shlensky, instructed Raca "to send us copies of the news items showing all of the price violations by the Milgram people," and said "I want to caution you about selling to any tobacco, candy, notion, grocery jobbers, etc., quantities beyond their normal requirements and purchases they have made heretofore." On June 24, 1949, Miles' Shupert wrote Raca that "we are checking on several of their (Milgram's) sources of supply and if we can get complete evidence we will stop their activities along this line." And, in his letter of October 19, 1949, Shupert again admonished Raca "that you should carefully watch any account in your territory that might be supplying them (Milgram) with this merchandise," warned him that Milgram "could very easily be buying Alka-Seltzer from one of your tobacco or candy accounts" (none of whom were shown to have been factors), pointedly told Raca that "if you can find if any of them have sold any merchandise to Milgram * * * you should warn them that Milgram should not be sold," and assured him that "if you can find out any information through any employee in their (Milgram's) warehouse as to where they can get this merchandise, it certainly would be a feather in your hat because we would cut them off immediately."

Katz' Shlensky and Blond, who had been "biding time" while Miles unsuccessfully sought to ascertain and cut off Milgram's source of supply, finally concluded that "we were not going to ignore" the Milgram competition any longer, "whatever conseqences * might come." Having "prepared ourselves by having a very heavy quantity of merchandise in the warehouse," Katz advertised the "60c size" of Alka-Seltzer for 33c on Sunday, October 30, 1949. The following day Philip Small, president of Parkview Drugs, Inc., operating seventeen drug stores in Kansas City, sent Miles a copy of the Katz advertisement, assuring Miles in the letter of transmittal that "the price of Alka-Seltzer has always been maintained according to your wishes at 49c by all drug chains during the past years," pointing out that "Alka-Seltzer has been broken to 33c" by Katz, inquiring about "your attitude in this matter," and affirming Parkview's desire *"to work with you as we have done in the past."* Miles' Raca also reported the Katz advertisement to his superior, McKee.

"Within the next day or two," President Beardsley of Miles called Katz' Shlensky over long distance. Shlensky pointed out to Beardsley that Katz "had, at the expenditure of many millions of dollars, built

up a reputation with the public for being severely competitive," that "we were being very embarrassed" by Milgram's "price competition on Miles Alka-Seltzer that we had taken * for an extended period of time and, in cooperation with Miles, we hadn't done anything about it," and that "we finally felt that we had to meet competition." Beardsley launched into an extended discussion of price maintenance, "confirmed that Miles had been the protector of the drug industry or one of the most important ones for a good many years," told Shlensky that he "should be ashamed to talk about meeting grocery store competition," and "asked that we discontinue advertising any cut price on Miles Alka-Seltzer." After some discussion of "the penalty of not adhering to their (Miles') price policy," Shlensky suggested that, if Miles should refuse to sell Katz in Kansas City, perhaps Miles would continue to sell Katz in "fair trade states." Beardsley "refused to go along with us on that" and bluntly "asked me (Shlensky) what we proposed to do." Shlensky said that "we would talk it over." The following day Shlensky called Beardsley, who was "very happy" when Shlensky told him that "we had decided to go along with Miles Laboratories on maintenance of prices" and "we would immediately discontinue the practice of cutting prices." Miles' Shupert promptly wrote Small, Parkview's president, "that we have contacted Katz * * and straightened out this matter satisfactorily—thank you very much for calling it to our attention." Thereafter, Katz observed Miles' suggested minimum retail [571] prices until another quo warranto proceeding against other respondents "was settled." Katz' Shlensky "knew then that Miles would not refuse to sell us if we cut prices, and we immediately started to meet competition and to cut prices on Alka-Selzer" and "we have been ever since."

The foregoing review of the evidence hearing on the Milgram-Katz affair will suffice to show Miles' avowed desire and obvious efforts to cut off Milgram's source of supply of Miles' products, whatever and wherever that source might have been; and, since Miles' Raca induced four wholesalers (in addition to three factors) to agree that each "would try to cooperate with us" in refusing to supply Milgram, the record fairly supports a finding that Miles entered into a combination, agreement or understanding, in direct violation of Section 416.-010, for the purpose of refusing to sell to Milgram. Empire Storage & Ice Co. v. Giboney, 357 Mo. 671, 675-676, 210 S.W.2d 55, 57(2), and cases there cited; affirmed 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834. However, we need not and do not rest our disposition of the case on such finding, for, in our view of the evidence, Miles also entered into resale price maintenance understandings with Milgram and with Katz.

Miles' defense is anchored to the "single trader doctrine,"

recognized in both our state[4] and federal[5] courts, that one engaged in a private business may buy from whomsoever he pleases and may sell, or refuse to sell, to whomsoever he will. But, there is an obvious difference between a mere refusal to sell and an agreement or understanding to fix or maintain retail prices [United States v. A. Schrader's Son, 252 U.S. 85, 99, 40 S.Ct. 251, 64 L.Ed 471, 475], even though the path between the two may be narrow [United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 729, 64 S.Ct. 805, 88 L.Ed. 1024, 1039] and the line of demarcation may be indistinct and may defy precise definition. Shakespeare Co. v. Federal Trade Commission, 6 Cir., 50 F.2d 758, 760; Toledo Pipe-Threading Mach. Co. v. Federal Trade Commission, 6 Cir., 11 F.2d 337, 342. And, the single trader doctrine, as stated in the leading case of United States v. Colgate Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443, has been "much hedged about by later cases," confers only a "limited dispensation" [Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277, 1299-1300], and certainly affords no license for a combination, agreement or understanding forbidden by our antitrust statutes. Dietrich v. Cape Brewery & Ice Co., 315 Mo. 507, 521, 286 S.W. 38, 43. In respect to the so-called Milgram-Katz affair, Miles was not content to pursue a policy of mere refusal to sell, and its activities cannot be justified under the single trader doctrine.

We have not overlooked Shlensky's answer on cross-examination, on which Miles leans heavily, that "we never had an agreement with Miles, no, just an understanding"; but, *when read in context*, that statement simply tends to confirm the existence of an unlawful and prohibited "understanding". Miles' contention that, as used in Sections 416.010 to 416.040, incl., the term "understanding" connotes "an agreement of opinion or feeling" [Webster's New International Dictionary, 2nd Ed., p. 2769] rather than mere knowledge, discernment [572] or comprehension [cf. United States v. United Shoe Machinery Co., D.C. Mo., 234 F. 127, 148] may be conceded. But, a combination, agreement or understanding violative of our anti-trust statutes may be either express or implied[6] and may be proved as effec-

---

[4] Dietrich v. Cape Brewery & Ice Co., 315 Mo. 507, 520-521, 286 S.W. 38, 43(14); Staroske v. Pulitzer Pub. Co., 235 Mo. 67, 79, 138 S.W. 36, 39-40(9); State ex rel. Crow v. Firemen's Fund Ins. Co., 152 Mo. 1, 46, 52 S.W. 595, 608; Heim Brewing Co. v. Belinder, 97 Mo.App. 64, 69, 71 S.W. 691, 692.

[5] United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992, 997(3), 7 A.L.R. 443, 448; Federal Trade Commission v. Gratz, 253 U.S. 421, 428-429, 40 S.Ct. 572, 64 L.Ed. 993, 996; Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 573, 44 S.Ct. 162, 68 L.Ed. 448, 455(2); Nelson Radio & Supply Co. v. Motorola, 5 Cir., 200 F.2d 911. 914(7). certiorari denied 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356; Adams-Mitchell Co. v. Cambridge Distributing Co., 2 Cir., 189 F.2d 913, 916(4).

[6] State ex inf. Hadley v. Standard Oil Co., 218 Mo. 1, 458, 116 S.W. 902, 1046. affirmed 224 U.S. 270, 32 S.Ct. 406, 56 L.Ed. 760; cf. Frey & Son v. Cudahy Packing Co., 256 U.S. 208, 210, 41 S.Ct. 451, 65 L.Ed. 892, 894-895(2); Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 455, 42 S.Ct. 150, 66 L.Ed. 307, 314, 19 A.L.R. 882.

tively by facts and circumstances as by direct evidence.[7] "When people set out to do acts that are either mala in se or mala prohibita, they do not put up a sign over the door, or a stamp on the act, declaring their purpose and intent" [State ex rel. Crow v. Firemen's Fund Insurance Co., 152 Mo. 1, 40, 52 S.W. 595, 606]; but, "in the field of illegal bargains the parties often take pains not to put into express words, either oral or written, a promise that is illegal but is in fact included by tacit understanding." Corbin on Contracts, Volume 1, Section 18, p. 36. Read with the foregoing in mind, the voluminous record in this case satisfies and convinces us that Katz not only had an understanding *of* Miles' price maintenance policy and the probable consequences of refusal to follow it (to which, as Miles contends, Katz' "understanding" was limited) but also had an understanding *with* Miles as to maintenance of the retail price of Alka-Seltzer.

■ We are persuaded also that, about the time Milgram began to handle drug items in 1940, Miles and Milgram entered into an understanding as to maintenance of the retail price of Alka-Seltzer. Although this was more than three years prior to institution of this proceeding, the applicable limitation prescribed by Section 516.130 does not refer to the date of entry into the forbidden agreement or understanding but rather to the date of the last proven act thereunder [State on inf. of Taylor v. American Ins. Co., 355 Mo. 1053, 1118-1119, 200 S.W. 2d 1, 43(28); State ex inf. Attorney General v. Arkansas Lumber Co., supra, 260 Mo. loc. cit. 292, 169 S.W. loc.cit. 170(15)]; and, in the instant case, the parties continued to act under the same understanding until Milgram's Levine, by advertisement of reduced prices in March, 1949, touched off the chain reaction which resulted in institution of this proceeding on June 29, 1950.

That Katz (after another quo warranto proceeding against other respondents "was settled") and Milgram (in March, 1949) sold Alka-Seltzer at reduced prices and thus "were treacherous" to Miles does not tend to disprove existence of the unlawful understandings as to retail price maintenance, for parties to unlawful as well as lawful understandings may, for selfish purposes, violate them. State ex rel. Crow v. Firemen's Fund Ins. Co., supra, 152 Mo. loc.cit. 40, 52 S.W. loc.cit. 606.

■ Finding that Miles entered into understandings with Katz and with Milgram, which were designed to maintain the resale price of Alka-Seltzer and tended to lessen full and free competition in the sale thereof, it becomes necessary to rule the issue, presented as one of

[7]Dietrich v. Cape Brewery & Ice Co., supra, 315 Mo. loc.cit. 520, 286 S.W. loc. cit. 43(11); State ex inf. Attorney General v. Arkansas Lumber Co., supra, 260 Mo. loc.cit. 306, 169 S.W. loc. cit. 174(20); Eastern States Retail Lumber Dealers' Ass'n. v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490, 1499, L.R.A. 1915A 788; Thomsen v. Cayser, 243 U.S. 66, 84, 37 S.Ct. 353, 61 L.Ed. 597, 605-606.

first impression in this jurisdiction, as to whether *vertical* resale price maintenance agreements or understandings are within the prohibition of our anti-trust statutes. We have examined·all of the numerous cases cited by diligent and resourceful counsel (most of which are discussed in the annotations at 7 A.L.R. 449, 19 A.L.R. 925, 32 A.L.R. 1087, 103 A.L.R. 1331 and 125 A.L.R. 1335), bearing upon the validity of vertical price maintenance agreements *at common law*. The federal courts held that such agreements [573] were invalid at common law;[8] but, as the cited A.L.R. annotations demonstrate, there was hopeless confusion in the holdings of the state courts. We need not and do not pursue the debatable question as to whether the St. Louis Court of Appeals, in the only Missouri case in which this subject has been mentioned [Clark v. Frank, 17 Mo.App. 602], held (or intended to hold) that resale price maintenance agreements were valid under the common law in Missouri, for the instant inquiry is whether such agreements are valid *under our anti-trust statutes* which are highly salutary and remedial in their purpose [State v. Green, 344 Mo. 985, 988, 130 S.W.2d 475, 476(2)] and were enacted in aid of and to supplement the common law. State ex inf. Hadley v. Standard Oil Co., supra, 218 Mo. loc.cit. 359-360, 425, 116 S.W. loc.cit. 1012, 1034.

Our Missouri anti-trust law is written in such plain and comprehensive language that this court on one occasion thought that it "leaves scant room for construction" [State ex rel. Kimbrell v. People's Ice, Storage & Fuel Co., 246 Mo. 168, 221, 151 S.W. 101, 118] and later said that it "is so explicit and all-inclusive in its language that there is left no room for construction by the courts." State ex rel. Barrett v. Boeckeler Lumber Co., 301 Mo. 445, 544, 256 S.W. 175, 204. Sections 416.010 and 416.020 denounce and condemn *any person* entering into *any* combination, agreement or understanding with *any other person or persons* (note the use in the disjunctive of both singular and plural) in restraint of trade or competition or to regulate, control, fix or maintain the price of any article; and, Section 416.040 is directed against *all* arrangements, contracts, agreements, combinations or understandings between *any two or more persons* designed or tending to lessen full and free competition in, or to increase the market price of, any product. Any reported opinion should be read in the light of the facts of that particular case,[9] and it would

[8]Boston Store of Chicago v. American Graphophone Co., 246 U.S. 8, 25, 38 S.Ct. 257, 62 L.Ed. 551, 559(3); Butterick Co. v. Federal Trade Commission, 2 Cir.. 4 F.2d 910, 912(2), certiorari denied 267 U.S. 602. 45 S.Ct. 462, 69 L.Ed. 808; Waltham Watch Co. v. Keene, D.C. N.Y., 202 F. 225, 234(2), affirmed without opinion 209 F. 1007, certiorari denied 232 U.S. 724, 34 S.Ct. 602, 58 L.Ed. 815; Kellogg Toasted Corn Flake Co. v. Buck, D.C. Cal., 208 F. 383.

[9]Morse v. Consolidated Underwriters, 349 Mo. 785, 789. 163 S.W. 2d 586, 587(1): State ex rel. Major v. Missouri Pac. Ry. Co., 240 Mo. 35, 53, 144 S.W. 1088, 1092(6); State ex rel. Chicago, R.I. & Pac. Ry. Co. v. Smith, 172 Mo. 446, 460(4), 72 S.W. 692, 695.

be unfair as well as improper "to give permanent and controlling effect to casual statements outside the scope of the real inquiry" [Rauch v. Metz, Mo., 212 S.W. 353, 357(3)] in the cases cited by Miles,[10] none of which involved or ruled the validity of resale price maintenance agreements but upon which Miles here relies to establish that "the Missouri anti-trust laws condemn only (horizontal) combinations among competitors absent a monopoly." Adoption of Miles' theory that our "anti-trust statutes are aimed solely at combinations of competitors," or acceptance of Miles' further contention that, in any event, a charge of violation of our anti-trust statutes "must be based upon a body of transactions constituting a system of resale price maintenance," would require us to interpolate and read into the statutes exceptions which obviously are not there and which we have no right to put there. State ex rel. Barrett v. Boeckeler Lumber Co., supra, 301 Mo. loc.cit. 544-545, 256 S.W. loc.cit. 204.

But if (contrary to our expressed opinion) the case at bar afforded any reason or basis for judicial construction of the Missouri anti-trust law, we are reminded that the primary rule in statutory [574] construction is to ascertain and give effect to the legislative intent [see cases collated in West's Missouri Digest, Vol. 26, "Statutes", Key No. 181(1)] and that remedial statutes enacted in the interest of the public welfare should be construed with a view to suppression of the mischief sought to be remedied.[11] The conditions which motivated enactment in 1891 of anti-trust legislation in Missouri have been recently considered and discussed at length in the exhaustive and erudite report of Special Commissioner Rush H. Limbaugh in State on inf. Taylor v. Armour & Co., No. 42185 [not reported], to which the interested are referred.[12] As was so ably demonstrated in that report, nothing in the literature or recorded incidents of that period indicates "that the revolt against the evils in the business practices of the times * * * was less determined or less articulate" against vertical price-fixing than against horizontal price-fixing, and "there is nothing in the provisions of the three sections [Sections 416.010, 416.020 and 416.040] * * * and nothing in their history which indicates that by them the legislature meant only to invalidate (horizontal) price-fixing combinations among competitors."

The record before us is replete with what counsel for one respondent aptly denominated as "elaborate philosophical discussions" concern-

---

[10]State ex inf. Hadley v. Standard Oil Co., supra, 218 Mo. loc.cit. 416-417, 116 S.W. loc.cit. 1031; State ex inf. Crow v. Continental Tobacco Co., 177 Mo. 1, 32, 75 S.W. 737, 746; International Harvester Co. v. Missouri, 234 U.S. 199, 209, 34 S.Ct. 859, 58 L.Ed. 1276, 1281, 52 L.R.A.(N.S.) 525.

[11]Co-operative Live Stock Commission Co. v. Browning, 260 Mo. 324, 344, 168 S.W. 934, 938(2); State ex rel. Laundry, Inc. v. Public Service Commission, 327 Mo. 93, 106, 34 S.W.2d 37, 42-43(3); Dodd v. Independence Stove & Furnace Co., 330 Mo. 662, 671, 51 S.W.2d 114, 118(11).

[12]See also Commissioner Limbaugh's excellent and enlightening article on "Historic Origins of Anti-Trust Legislation," 18 M.L.R. 215-248 (1953).

ing the economic desirability vel non of fair trade legislation, all of which is beyond and without the pale of our inquiry. For, when the legislature, acting within its constitutional orbit, has declared the public policy of the state, "such declared policy is sacred ground which we may not invade" [State ex rel. Barrett v. Boeckeler Lumber Co., supra, 301 Mo. loc.cit. 544, 256 S.W. loc.cit. 204][13] and we are not permitted to concern ourselves "with the winds of economic doctrine." Yankwich, "Competition, Real or Soft?", 14 F.R.D. 199, 216. The proponents of fair trade legislation, having been rebuffed in their repeated and persistent efforts to obtain enactment thereof by our General Assembly, may not attain the same end by judicial fiat. We are satisfied that, as has been stated in respect of the Texas anti-trust statutes which are "very similar" to ours [State ex inf. Hadley v. Standard Oil Co., supra, 218 Mo. loc.cit. 361, 116 S.W. loc.cit. 1013], "(i)t is certainly the intention of our anti-trust laws to guarantee dealers in this state the untrammeled right to sell goods, wares, merchandise, and products owned by them at such prices as they may determine" [Ford Motor Co. v. State, 142 Tex. 5, 175 S.W.2d 230, 235(14)] ; and, we conclude, as did Commissioner Limbaugh in the Armour case, that there is no escape from the conclusion that vertical agreements or understandings for fixing or maintaining resale prices are within the prohibition of our Missouri anti-trust statutes.[14]

▆ [575] Our finding that Miles entered into illegal resale price maintenance understandings with Katz and Milgram makes it unnecessary to review and discuss the evidence pertaining to administration of Miles' "refusal to sell policy" elsewhere in Missouri. It will suffice to point out that an unlawful agreement to fix or maintain prices may not be inferred from uniformity of prices charged for a given article, absent any showing that such uniformity is an artificial

---

[13]See also State ex rel. Kimbrell v. People's Ice, Storage & Fuel Co., supra, 246 Mo. loc.cit. 221-222, 151 S.W. loc.cit. 118(25); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221-222, 60 S.Ct. 811, 84 L.Ed. 1129, 1167; Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 195-196, 57 S.Ct. 139, 81 L.Ed. 109, 120(3), 106 A.L.R. 1476; Hills Bros. v. Federal Trade Commission, 9 Cir., 9 F.2d 481, 485-486(11); Miles Laboratories v. Seignious, D.C. S.C., 30 F.Supp. 549, 552-553.

[14]Under the Sherman Anti-Trust Act [15 U.S.C.A. Secs. 1-7], similar "in substance" to our anti-trust statutes [State ex Inf. Attorney General v Arkansas Lumber Co., supra, 260 Mo. loc.cit. 286-289, 169 S.W. loc.cit. 168-169], resale price maintenance is illegal except where the Miller-Tydings Act [50 Stat. 693, 15 U.S.C.A. Sec. 1] is applicable. Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 386, 71 S.Ct. 745, 95 L.Ed. 1035, 1043(2); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 721, 64 S.Ct. 805, 88 L.Ed. 1024, 1034(4); United States v. Univis Lens Co., 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408, 1418(4); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502.

condition,[15] and that, considered in the light of this principle, the evidence in the instant case affords insufficient support for relator's contention that Miles' activities "resulted in a system of implied agreements and understandings with retailers throughout the state."

The record before us reflects no challenge of or threat to Miles' resale price maintenance policy in the Kansas City area, other than that posed by the sales of Alka-Seltzer at reduced prices by Katz and Milgram, who are in that market the leading "cut-rate" competitors in drug sundries, as was stated by Parkview's Small whose seventeen drug stores in Kansas City put Parkview in third place far behind Katz; and, the transcript adequately demonstrates that Miles regarded the so-called Milgram-Katz affair as of major significance and importance. Indeed, the understanding between Miles and Katz was reached with Miles' president and as a direct result of his blunt and effective "persuasion", so Miles' instant difficulty may not now be laid at the door of hirelings, in absentia at the trial, *presently* said to have had no authority to "administer" Miles' "refusal to sell policy" in Missouri,[16] nor may it be brushed aside or dismissed summarily as the unfortunate but excusable product of sporadic activity on the part of overly-enthusiastic sales representatives. Miles, with a not inconsiderable background of knowledge and experience in this field, apparently took in respect of the Milgram-Katz affair a calculated risk that its action in this "non-fair trade state" would not become the subject of judicial scrutiny and review. After careful consideration of every aspect of the matter, we are of the opinion that assessment of a fine of $5,000 and costs against Miles, in lieu of forfeiture of its right and privilege to do business in this state [Section 416.070], constitutes a reasonable penalty for Miles' violations of our anti-trust statutes.

It is, therefore, the judgment of this court that, upon our finding of Miles' guilt in the particulars hereinbefore stated, a fine of $5,000 and the costs of this proceeding should be and hereby are assessed against Miles, which said fine and costs shall be paid to the Clerk of this Court within sixty days after the date of adoption of this opinion; that, should Miles fail to pay said fine and costs within the stated period, the State of Missouri shall have execution therefor to be levied by the Marshal of this Court and enforced according to the laws of this state in such cases made and provided, this Court retaining juris-

---

[15]State ex rel. Taylor v. Anderson, 363 Mo. 884, 891, 254 S.W. 2d 609, 614; State on inf. of Taylor v. American Ins. Co., 355 Mo. 1053, 1087, 200 S.W. 2d 1, 22; United States v. United States Steel Corp., 251 U.S. 417, 448-449, 40 S.Ct. 293, 64 L.Ed. 343, 352.

[16]Section 416.070 provides that, in all proceedings for violation of our anti-trust statutes, "proof of the acts of any person who has been acting as the agent of such corporation in transacting its business in this state in the name, behalf or interest of such corporation shall be received as prima facie proof of the acts of the corporation itself."

368

diction of the case until said fine and costs be paid by Miles; and, that all of the other respondents herein should be and hereby are discharged without day.

All concur, except *Eager, J.*, not sitting.