Alvin BROOKS, et al.,
Respondents/Cross–
Appellants,

v.

STATE of Missouri and Attorney General Jeremiah W. (Jay) NIXON, Appellants/Cross–Respondents,

James Murphy, Defendant,

Bull's Eye, L.L.C., et al.,
Appellants/Cross–
Respondents.

No. SC 85674.

Supreme Court of Missouri,
En Banc.

Feb. 26, 2004.

As Modified on Denial of Rehearing
March 30, 2004.

Jeremiah W. (Jay) Nixon, Atty. Gen., Paul C. Wilson, Deputy Chief of Staff, Alana M. Barragan-Scott, Chief Counsel, William J. Bryan, Asst. Atty. Gen., Jefferson City, Peter von Gontard, Russell L. Makepeace, St. Louis, for Appellants/Cross-Respondents.

Gordon D. Schweitzer, St. Louis, for Defendant.

Burton W. Newman, Clayton, Richard C. Miller, Kansas City, for Respondents/Cross-Appellants.

Michael B. Minton, Richard P. Cassetta, Jason A. Wheeler, Thompson Coburn, LLP, St. Louis, Stephen P. Halbrook, Richard E. Gardiner, Fairfax, VA, for amicus curiae National Rifle Association of America, Inc.

Jay D. Haden, Kathleen A. Kedigh, Office of the Jackson County Counselor, Joel Pelofsky, Kansas City, amicus curiae for Jackson County, Missouri.

STEPHEN N. LIMBAUGH, JR., Judge.

This is an appeal from a judgment of the Circuit Court of the City of St. Louis declaring the recently enacted Concealed–Carry Act, sections 50.535, 571.030 and 571.094, RSMo, unconstitutional. Because this case involves the validity of a state statute, this Court has exclusive appellate jurisdiction. MO. CONST. art. V, sec. 3.[1]

## I.

On September 11, 2003, a super-majority of the Missouri General Assembly overrode a gubernatorial veto to pass House Bills 349, 120, 136, and 328—the Concealed–Carry Act—which repealed section 571.030, RSMo, and enacted three new sections, 50.535, 571.030, and 571.094, in its place. A key component of the Act is to allow citizens to obtain a permit to carry concealed firearms provided they meet certain enumerated qualifications. To implement the Act, county sheriffs are re-

quired, *inter alia*, to fingerprint and conduct criminal background checks on all applicants and otherwise determine whether they meet the statutory qualifications. They are then to issue permits accordingly, and, under certain circumstances, to suspend or revoke the permits.

The Concealed–Carry Act was scheduled to go into effect 30 days after the override, on October 11, 2003. However, on October 8, 2003, a group of eleven plaintiffs[2] filed suit against the State of Missouri and the Missouri Attorney General seeking a permanent injunction to stop enforcement of the Act and a declaratory judgment that the Act was unconstitutional. Although plaintiffs listed several grounds for the suit, the ensuing litigation focused primarily on alleged violations of article I, section 23, and article X, sections 16 and 21, of the Missouri Constitution, which pertain to the right to bear arms and the "Hancock Amendment," respectively.

In response to the suit, defendants immediately filed a "Motion to Transfer Venue" to Cole County, which was heard and denied on October 9 after plaintiffs filed an amended petition adding the Sheriff of the City of St. Louis as a party defendant.[3] The next day, October 10, three additional defendants, Bull's Eye, L.L.C., and its principals, Jim Stephens and Geri Stephens, were allowed to intervene on their own motion and testify about the negative effect an injunction would have on their firearms training business. That same day, after an extended hearing, the trial court entered a preliminary injunction

---

**1.** National Rifle Association of America, Inc. and Jackson County, Missouri, have filed briefs as *amici curiae*.

**2.** The list of plaintiffs included Alvin Brooks, Carl Wolf, Bishop Willie James Ellis, Richard Clark Miller, Pastor B.T. Rice, Lyda Krewson, Senator Joan Bray, Senator Maida Coleman, Senator Rita Heard Days, Scott Burnett, and

the Institute for Peace and Justice, though the Institute was later dismissed for lack of standing.

**3.** On appeal, defendants have abandoned the venue issue for the stated reason that they do not wish to delay a decision on the merits.

against the state enjoining enforcement of the Act. To effectuate the injunction, plaintiffs were ordered to, and did, post a bond in the amount of $250,000.

The court reconvened on October 23 for a final hearing on all matters. Both sides presented evidence, but only on one issue: whether implementation of the Act would require county sheriffs to increase their activities and incur additional costs, triggering the Hancock Amendment's prohibition of unfunded mandates. Testimony was taken, in particular, from the Sheriffs of Greene, Cape Girardeau and Camden Counties and a representative from the Jackson County Sheriff's Office. Then on November 7, the court issued a final declaratory judgment in favor of plaintiffs, holding that the Act violates article I, section 23, and permanently enjoining enforcement of the Act in its entirety, but the court specifically rejected plaintiffs' Hancock claim and all other claims. Defendants appeal and plaintiffs cross-appeal those parts of the judgment by which they are aggrieved.

## II.

■ Article I, section 23, states:

That the right of every citizen to keep and bear arms in defense of his home, person and property, or when lawfully summoned in aid of the civil power, shall not be questioned; *but this shall not justify the wearing of concealed weapons.*

(emphasis added).

Plaintiffs contend, and the trial court so held, that the last clause of section 23 "prohibits the wearing of concealed weapons." Read in proper grammatical context, and giving the words their common usage, the clause has no such meaning. To be sure, plaintiffs are correct that the clause is couched as an exception or limitation on the constitutional "right of every

citizen to keep and bear arms...." But it means simply that the constitutional right does not extend to the carrying of concealed weapons, not that citizens are prohibited from doing so, or that the General Assembly is prohibited from enacting statutes allowing or disallowing the practice.

Parsing the clause proves the point. The subject is the word "this," which refers back to "the right of every citizen to keep and bear arms...." The operative words are "shall not justify." "Shall not," which are words of prohibition, modifies "justify," which is:

> **1a:** to prove or show to be just, desirable, warranted or useful: VINDICATE ... **b:** to prove or show to be valid, sound or conforming to fact or reason: furnish grounds or evidence for: CONFIRM, SUPPORT, VERIFY ... **c(1)** to show to have had sufficient legal reason....

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1228 (3d ed.1993). Thus, the clause in its entirety must be read in this way: "but this [the right of every citizen to keep and bear arms ...] shall not justify [shall not warrant, shall not furnish grounds or evidence for, shall not support, or shall not provide sufficient legal reasons for] the wearing of concealed weapons."

■ In short, the words used are plain and unambiguous. There is no constitutional prohibition against the wearing of concealed weapons; there is only a prohibition against invoking the right to keep and bear arms to justify the wearing of concealed weapons. Consequently, the General Assembly, which has plenary power to enact legislation on any subject in the absence of a constitutional prohibition, *Board of Educ. of City of St. Louis v. City of St. Louis,* 879 S.W.2d 530, 533 (Mo. banc 1994), has the final say in the use and regulation of concealed weapons. Accord-

ingly, this Court holds that the Concealed–Carry Act is not unconstitutional under article I, section 23.

### III.

In their cross-appeal, plaintiffs first raise interrelated Hancock challenges that derive from the new responsibilities imposed on county sheriffs in processing concealed weapons permits and the increased costs that will be incurred. These new requirements, plaintiffs contend, constitute an unfunded mandate in contravention of article X, sections 16 and 21, of the Missouri Constitution, which are provisions of the Hancock Amendment. Section 16 prohibits the state from "requiring any new or expanded activities by counties and other political subdivisions without full state financing, or from shifting the tax burdens to counties and other political subdivisions." Section 21 is to the same effect.

The argument is complicated. Although the Concealed–Carry Act does not provide for "state financing" to fund new activities and costs, section 571.094.10 instructs sheriffs in each county to "charge [applicants] a nonrefundable fee not to exceed one hundred dollars," ostensibly to accomplish that same purpose. If the fee can properly be used to fund the new activities and costs, which is the state's position, there is no unfunded mandate. However, section 571.094.10 specifies that the fees are to be paid to the county "to the credit of the sheriff's revolving fund," which, under section 50.535.2 "shall only be used by law enforcement agencies for the purchase of equipment and to provide training." According to plaintiffs, because the new activities and costs will necessarily require expenditures other than those for equipment and training, the fee will be insufficient, and the legislative mandate still will be at least partially unfunded. Hence, the Hancock violation.

In identifying plaintiffs' Hancock claims, it must be emphasized that the challenge is only to the inadequacy of the fee to fund the mandate. Plaintiffs do not challenge, and therefore this Court does not address, the issue raised by the dissent, that is, whether a fee can satisfy or obviate the requirement of article X, sections 16 and 21, that state mandates be funded by "full state financing." *See* art. X, secs. 16 and 21. The parties apparently characterize the fee—at least to the extent that it funds or partially funds the mandate—as a permissible "user fee." As so characterized, it does not require a vote of the people under article X, section 22(a), another Hancock provision, that otherwise prohibits counties and political subdivisions from levying any "tax, license or fees," without voter approval. *See Keller v. Marion County Ambulance Dist.*, 820 S.W.2d 301, 304–5 (Mo. banc 1991). But the question remains open, because it was not raised by the parties, as to whether a fee imposed by a sheriff, under the authority of section 571.094.10, is a user fee at all or whether it is more accurately characterized as a "tax, license or fee" that must be approved by the county's voters under article X, section 22(a), before it may take effect in that county.

### A.

As a preliminary matter, the state contends that the plaintiffs have no standing to raise the Hancock challenge and that the case is not ripe for adjudication. In the Hancock context, standing is conferred not by caselaw, but by the Constitution. Article X, section 23, states " . . . any taxpayer of the state, county or other political subdivision shall have standing to bring suit in a proper venue . . . to enforce provisions of sections 16 through 22 inclusive of the article . . . ." Under section 23, plaintiffs claim taxpayer standing to enjoin

enforcement of the Act statewide. At first glance, though, the challenge is to a fee imposed only on the county level, which means that standing can be met only by individual taxpayers within each county. However, by directing that the sheriff in each county *shall* charge a fee of up to $100 for issuance of each permit, it is the state that is imposing the fee, and it is doing so on a statewide basis. As such, plaintiffs have taxpayer standing to challenge the Act statewide, but, as will be discussed, a statewide remedy is inappropriate.

■ Although plaintiffs have standing, they must still establish that the case is ripe, which means, in general, that "the parties' dispute is developed sufficiently to allow the court to make an accurate determination of the facts, to resolve a conflict that is presently existing and to grant specific relief of a conclusive character." *Mo. Health Care Ass'n v. Attorney General of the State of Mo.*, 953 S.W.2d 617, 621 (Mo. banc 1997). Under Hancock, a case is not ripe without specific proof of new or increased duties and increased expenses, and these elements cannot be established by mere "common sense," or "speculation and conjecture." *Miller v. Director of Revenue*, 719 S.W.2d 787, 789 (Mo. banc 1986). "This Court will not presume increased costs resulting from increased mandated activity." *City of Jefferson v. Mo. Dept. of Natural Resources*, 863 S.W.2d 844, 848 (Mo. banc 1993) (*City of Jefferson I* ). On the other hand, plaintiffs need only show that the increased costs will be more than *de minimis*. *City of Jefferson v. Mo. Dept. of Natural Resources*, 916 S.W.2d 794, 795 (Mo. banc 1996) (*City of Jefferson II* ).

■ As noted, the testimony regarding anticipated activities and costs in implementing the Act pertained to only four counties—Jackson, Greene, Cape Girardeau, and Camden. The evidence from Jackson County, all uncontroverted, was that costs of approximately $150,000 will be incurred in the first year alone to provide the personnel to fingerprint and conduct background checks on applicants and to otherwise process the permit applications. That projection was based on an estimated 5,000–6,000 applications, which in turn were based on county population and the fact that under existing law, approximately 5,000 firearms transfer permits are issued in the county each year. Testimony was also presented that in addition to the $150,000 cost for personnel, it would be necessary to engage the Missouri State Highway Patrol to conduct a "fingerprint analysis," which is part of each applicant's background check, and that for each applicant, the county would incur increased costs of at least $38, which is the sum charged by the Patrol for each case.

The evidence from the other three counties was sparse, but ultimately each of the three sheriffs testified definitively that to discharge their new responsibilities, they, too, would find it necessary to engage the Highway Patrol to conduct fingerprint analysis at $38 per case. Although there was little evidence to show the estimated number of permit applicants in each county, it is not disputed that there will be more than a few. The fact remains, though, that even if there are only a few, for each one the increased cost to each county will be at least $38, and as a result, the case is ripe in each county.

Despite this conclusion, in the absence of specific proof of increased costs in the remaining Missouri counties, disposition of the case as to those counties is premature. *See City of Jefferson II*, 916 S.W.2d at 796–97 (holding that proof of increased costs must be shown by each city or county affected by an unfunded statutory mandate to file solid waste management plans

with the Department of Natural Resources). To reiterate, this Court will not presume an increase in costs. Even though the challenge to the statewide mandate may properly be brought in a single suit, ripeness must be determined county by county. *See id.*

## B.

■ On the merits of plaintiffs' claim, the question is whether the provision for a sheriff's fee of up to $100—assuming the fee is otherwise constitutional—is sufficient to fund the increased costs in each county. The fee cannot be used to offset costs directly, but must be credited to the sheriff's revolving fund, section 571.094.10, which can be used only for training and equipment, section 50.535.2. Although some of the increased costs may be incurred for training and equipment and properly reimbursed from the fund, substantial costs may be incurred for other purposes, as well. If so, there is an unfunded mandate. This conclusion, of course, governs application of the Act in all of Missouri's counties, but, in this case, specific evidence of increased costs was indeed presented for the four counties at issue. In fact, the same evidence that makes the case ripe for adjudication as to those counties—the costs for personnel in Jackson County and for the Highway Patrol fingerprint analyses in all four counties—is the same evidence that proves the Hancock violation on the merits of the case. This Court holds, therefore, that the Act constitutes an unfunded mandate in Jackson, Cape Girardeau, Greene, and Camden Counties for which an injunction will lie prohibiting enforcement by the state. *See City of Jefferson II,* 916 S.W.2d at 796–97. These counties are not required to comply with the Act to the extent that it mandates them to expend funds for that purpose.

■ That said, however, the parties do not raise, nor do we address, the question of whether a county's governing body can still elect to fund the increased costs on a voluntary basis from other county revenue sources that are not dedicated for some other mandated use. In any event, that portion of increased costs attributable to training and equipment can still be recouped by imposition of a sheriff's fee, again assuming the fee is constitutional. However, in the event the fee charged exceeds the amount of estimated actual costs of training and equipment necessary for processing the permit applications, as has been proposed by the three sheriffs testifying in this case, that excess cannot fairly be characterized as a permissible "user fee." Instead, it falls within article X, section 22, of the Hancock Amendment, which, as explained, prohibits counties and other political subdivisions from levying any "tax, license or fees" without voter approval.

This Court also notes that under section 50.535.3, sheriffs of first-class counties have the option to "designate one or more chiefs of police of any town, city or municipality within such county to accept and process [concealed-carry permit applications and then] reimburse such chiefs of police, out of the moneys deposited into [the sheriffs revolving fund] for any reasonable expenses related to accepting and processing such applications." In theory, this provision allows some sheriffs to defer most, if not all, of their increased activities and costs under the Act.

Finally, this Court holds that certain provisions of the Act do not implicate the Hancock Amendment and are not subject to injunctive relief. For instance, the re-enacted section 571.030—the "unlawful use of weapons" statute—provides that any person twenty-one years or older may lawfully transport a concealable firearm in the

passenger compartment of a motor vehicle. Sec. 571.030.3. It also authorizes persons in specific situations to discharge, exhibit, or carry firearms or other weapons while engaged in a lawful act of self-defense, sec. 571.030.1(3)-(10). Additionally, subsections 20 and 21 of section 571.094 prohibit the carrying of concealed weapons in certain areas and locations (*e.g.,* churches, courthouses, and schools), with exceptions, and sets out civil penalties for failing to leave those areas and locations upon request. These are provisions that are not affected by any unfunded mandate under Hancock.

### IV.

Plaintiffs raise two other claims that merit little attention. Both are denied.

First, plaintiffs contend that the Act is unconstitutionally vague because it fails to provide adequate notice of the prohibited conduct and set standards for its fair enforcement. Plaintiffs' sole support for their argument, however, consists of nothing more than a series of far-fetched hypotheticals. This approach is inconsistent with the long-standing rule in addressing such claims that "it is not necessary to determine if a situation could be imagined in which the language used might be vague or confusing; the language is to be treated by applying it to the facts at hand." *State v. Lee Mechanical Contractors,* 938 S.W.2d 269, 271 (Mo. banc 1997). At some time in the future plaintiffs' hypotheticals might arise as actual disputes; however, at this time they are merely conjecture.

Second, plaintiffs argue that the Act "usurps the people's will as expressed by the defeat of Proposition B in 1999." The defeat of Proposition B, they explain, should preclude subsequent legislative action that allows what the Proposition would have allowed—the carrying of concealed weapons. No court, at least in this state, has ever so held, and obviously, to do so would be to call into question the entire concept of representative democracy.

### V.

For the foregoing reasons, the judgment of the trial court declaring the Concealed–Carry Act unconstitutional under article I, section 23, is reversed. The judgment of the trial court dismissing the Hancock claims under article X, sections 16 and 21, is reversed as it applies to Jackson, Cape Girardeau, Greene, and Camden Counties, and judgment is entered enjoining the state of Missouri from enforcing the Act, but only to the extent it constitutes an unfunded mandate imposed on those counties. The judgment of the trial court dismissing the Hancock claims as applied to all other counties is affirmed because of lack of ripeness, and the trial court's injunction prohibiting enforcement of the Act in those counties is therefore dissolved. The case is remanded for disposition of the bond under section 526.200 and assessment of costs and attorneys fees under article X, section 23.

WOLFF, BENTON, STITH and PRICE, JJ., concur.

WHITE, C.J., dissents in separate opinion filed.

TEITELMAN, J., concurs in opinion of WHITE, C.J.

WHITE, Chief Justice, dissenting.

I respectfully dissent. The Conceal and Carry Act is clearly unconstitutional for violating the Hancock Amendment and, being unconstitutional on that basis, the principal opinion inappropriately and needlessly reaches the issue with regard to the constitutional construction of article I, section 23 of the Missouri Constitution.

When analyzing the uncontroverted evidence from Jackson, Greene, Cape Girardeau, and Camden counties, the majority opinion determined that each of these counties had standing to bring a claim under Hancock and would incur additional costs associated with implementation of the Conceal and Carry Act. Based upon this determination, the principal opinion holds that the "Act" violates the Hancock amendment with respect to these four counties and holds that none of these counties is required to comply with the Act. While the majority reaches the correct result with regard to these four counties, it fails to truly address the issue that this newly created state mandate must be fully financed by the state. I would hold that no Missouri county is required to comply with the Act as a result of the unfunded mandate for which the State, and **only the State**, is required to *"fully finance."*

The principal opinion is incorrect in its assertions that the state-imposed increased costs incurred by the counties must be greater than *de minimis* and that disposition of this case as to the remaining counties and political subdivisions of Missouri is premature. Article X, section 16 provides in pertinent part:

> **The state is prohibited from requiring any new or expanded activities by counties and other political subdivisions without full state financing, or from shifting the tax burden to counties and other political subdivisions.**

Article X, section 21, states in pertinent part:

> **A new activity or service or an increase in the level of any activity or service beyond that required** by existing law shall not be required by the general assembly or any state agency of counties or other political subdivisions, **unless a state appropriation is made and disbursed to pay the county or other political subdivision for any increased costs.**

Nothing contained in sections 16 or 21 of article X require a showing that increased costs by the State's newly required activities must be greater than *de minimis*. The *de minimis* language in *City of Jefferson v. Mo. Dept. of Natural Resources*, as referenced by the majority, is merely dicta.[1] Hancock requires full state funding, period. Full state funding means funding from state revenue, and the $100 license fee authorized by the Act for county revenue is totally irrelevant.[2]

All of Missouri's remaining counties will incur an unfunded mandate to satisfy the Act's requirements for background checks, fingerprint analysis, and the associated administrative labor costs and record keeping each time an applicant applies for a

---

1. 916 S.W.2d 794, 795 (Mo. banc 1996) (*City of Jefferson II*). A judicial opinion should be read in light of the facts pertinent to that case, it being improper to give permanent and controlling effect to statements outside the scope of the real inquiry of the case. *State v. Miles Laboratories*, 365 Mo. 350, 282 S.W.2d 564, 573 (Mo. banc 1955). "[S]tatements ... are obiter dicta [if] they [are] not essential to the court's decision of the issue before it." *Richardson v. QuikTrip Corp.*, 81 S.W.3d 54, 59 (Mo.App.2002); *State ex rel. Anderson v. Hostetter*, 346 Mo. 249, 140 S.W.2d 21, 24 (Mo. banc 1940).

2. "[T]otal state revenue" is the sum (total) of "taxes, excises, customs, duties, and other sources of income" the state receives into its treasury in a given fiscal year. Except as to "credits not related to actual tax liabilities," this is a cash basis accounting definition because it requires actual receipt of the revenue by the state. **Moneys not paid into the treasury**, see Mo. Const. art. IV, sec. 15 (defining nonstate funds), **or not received in the fiscal year in question are not part of "total state revenues."** *Missourians for Tax Justice Educ. Project v. Holden*, 959 S.W.2d 100, 106 (Mo. banc 1997).

license to carry a concealed firearm.[3] The State essentially concedes this point and does not argue that the Act does not create additional services and activities increasing county expenditures, but rather urges that the evidence presented at trial demonstrates that the application fee authorized by the legislature will pay for those additional expenses.

The majority opinion claims that it is not addressing the issue as to whether or not a county's governing body can elect to fund the *"increased costs"* on a voluntary basis from other sources of county revenue, or from the fee authorized by the legislature.[4] And, in order to avoid the issue of the State's responsibility to fully fund its newly created mandate, the princi-

pal opinion mischaracterizes Cross–Appellant Brooks's arguments.[5] The opinion states that Brooks is only challenging the adequacy of the application fee authorized by the legislature to pay for the increased costs associated with implementing the Act. However, Brooks repetitively raises the comprehensive allegation that the State has failed to fully fund the mandate from any source of state revenue in violation of Hancock.[6] It is irrelevant whether the fee authorized is constitutional or even if it can be applied to cover part of the newly created costs. The argument, clearly presented by Brooks, is that the State's mandate is not fully funded by the State as Hancock requires. This is not a new issue raised by this dissent; it is clearly before the Court today.

---

**3.** See section 571.094.

**4.** Principal opinion, page 10.

**5.** Principal opinion, page 6.

**6.** Cross–Appellant's Brief (pages 80–81) lays out the constitutional requirements of Hancock and the core of Brooks's argument. "They [article X, sections 16 and 21] prevent the State from requiring counties or other political subdivisions to perform new or increased activities or services without providing a means for funding the increased costs caused by *each* mandated service or activity." (Page 81). Cross–Appellant's Brief pages 82–85, identifies all of the new activities mandated by the legislature in the newly enacted section 571.094.5. "**None of these activities, services, expenditures or risks can be funded under the Act** because the General Assembly limited expenditure of the application fees to 'the purchase of equipment and to provide training.' Section 50.535.2." (Page 85–86). "Even the State's witnesses admitted that they will be required to perform new or increased activities or services which will result in increased time and costs to their counties. **The Act, as written, violates the Hancock Amendment because it requires new or increased activities or services of counties and other political subdivisions without *any way* to pay for them, through application fees or**

**any state appropriation."** (Pages 86–87). "Thus, by its plain language, a violation of Art. X, § 21 exists if both (1) a new or increased activity or service is required or a political subdivision by the State, and (2) the political subdivision experiences increased costs in performing that activity or service." (page 87). "Brooks, et al., produced substantial evidence not only of new or increased activities or services mandated by the Act, but also of increased costs required to pay for these activities or services." (Page 87) Brooks, et al., also fully develops the argument as to what the words "any," "service" and "activity" mean in relation to how they are used in the Hancock Amendment on page 88 of their brief and concludes this portion of the brief with the argument that, "**[b]ecause the General Assembly failed to appropriate funds that can be used to pay for such new and increased activities and services, the Act is clearly unconstitutional."** (page 90). Perhaps the majority opinion focuses solely on the detailed argument in Cross–Appellant's reply brief that specifically attacks the applicability of the authorized license fee, and has overlooked Brooks's initial briefing of this issue. However, even in that specific argument Cross–Appellant argues that "... the Act prohibits what the Missouri Constitution requires—full funding of all new or increased activities and services." (Reply brief, page 13).

Hancock requires the State, and only the State, to fully fund this mandate. The individual counties and political subdivisions do not have legal authority to saddle their taxpayers with the unfunded mandate by drawing funds from other sources of county revenue. Any money diverted and expended by a county or political subdivision to finance the implementation of the Conceal and Carry Act, that is not provided directly from state revenue by a state appropriation, is money directly taken from the county taxpayers, each of whom has independent standing for injunctive relief. The principal opinion's delay in requiring compliance with Hancock for the remainder of Missouri's counties will merely result in unnecessary adjudications in the remaining Missouri counties not enjoined by today's holding.[7]

Former U.S. Representative Mel Hancock, the very author of the Hancock Amendment, has asserted that "It's pretty obvious that it [the concealed weapons law] is an unfunded mandate ... unless the state provides the money to do it, then that's an unfunded mandate."[8]  I would hold that until a specific appropriation is made by the state to cover the unfunded mandate imposed by the Act that no county need comply with implementing the Conceal and Carry Act.[9]

---

**7.** Following today's holding, once an application for a concealed firearms license is filed by a single individual, in each of the remaining "unenjoined" counties, a single taxpayer in that same county need only seek a declaratory judgment that the Conceal and Carry Act violates the Hancock Amendment and demonstrate *any* additional cost to the county resulting from the Act to succeed in enjoining its enforcement. The principal opinion's decision to unnecessarily delay application of Hancock to all of Missouri's counties will result in saddling these taxpayers with the unnecessary expense of the litigation involved and illustrates, with emphasis, the timeworn maxim, that justice delayed is justice denied. It should be noted, however, that, while the delay comes with a high cost in terms of lost time and judicial resources, the applicable unit of government named in the suit will be responsible for reimbursing the plaintiff for his or her costs, including reasonable attorneys' fees incurred in maintaining such suit. Article X, section 23. Thus, today's delay will merely inflict unnecessary expense upon the individual counties and political subdivisions to defend suits they can not possibly win. The majority opinion dictates this result by laying out the law of the case—that any evidence of increased costs imposed by the Act demonstrates an unfunded mandate (principal opinion, page 10). Should those governmental entities appeal their certain losses, will this Court grant transfer to the over 100 separate cases that will result, and then decide, one case at a time, the single issue it can decide with one opinion today?  Today's holding gives new meaning to the concept of judicial economy—that new meaning negates this concept entirely. The principal opinion states that this matter can be resolved in a single additional suit while at the same time asserting that nothing less than particularized evidence is required from each county for each individual claim to become ripe—only then will the Court agree to recognize the obvious Hancock violation on a county by county basis. (principal opinion, page 9). Perhaps a few of these cases may be consolidated, but that does not alter the fact that there is one case here before this Court today that could decide this clearly presented issue and that the delay caused by the principal opinion is totally unnecessary.  Brooks, et al. makes clear to this Court that there is a facial violation of the Hancock Amendment, i.e., there is no state funding anywhere in the Act to finance the state mandate, yet the principal opinion declines to address this issue.  (See footnote 6).  A speedy and authoritative decision would avoid the intolerable confusion created by the principal opinion's holding, which partially implements an unconstitutional law.

**8.** Tim Hoover, *Amendment 'could undo' conceal-carry*.  The Kansas City Star, January 25, 2004.

**9.** See *Rolla 31 School Dist. v. State*, 837 S.W.2d 1, 7 (Mo. banc 1992).

I would affirm the judgment of the trial court, finding sections 50.535, 571.030 and 571.094, as currently enacted, to be unconstitutional because they violate the Hancock Amendment by imposing an unfunded mandate upon the taxpayers of Missouri.[10] Finding the Act to be unconstitutional on this basis, negates the need for this Court to reach the issue with regard to the constitutional construction of article I, section 23 of the Missouri Constitution.

---

**10.** When trial court's decision is correct, even if based upon different reasoning, that decision will not be disturbed because the trial court gave a wrong or insufficient reason for it. *American Standard Ins. Co. v. Hargrave,* 34 S.W.3d 88, 92 (Mo. banc 2000).