George W. CARLISLE, Respondent,

v.

STATE DEPARTMENT OF PUBLIC HEALTH AND WELFARE, Appellant.

No. 7871.

Springfield Court of Appeals.

Missouri.

Dec. 9, 1960.

**618**

John M. Dalton, Atty. Gen., Hugh P. Williamson, Asst. Atty. Gen., Elmore G. Crowe, Jefferson City, for appellant.

Hal E. Hunter, Jr., New Madrid, for respondent.

McDOWELL, Judge.

Respondent, George W. Carlisle, applied for old age assistance benefits December 2, 1957. The application was rejected February 19, 1958, on the basis that he had transferred cash to his daughters without receiving a valuable consideration as required by statute. From this decision he perfected an appeal and a hearing was held before a Referee on June 25, 1958. Respondent appealed this decision to the Circuit Court of New Madrid County, and, on November 10, 1959, the court entered a judgment finding that the director's decision was arbitrary and unreasonable and remanded the cause with directions that respondent be restored to the old age assistance rolls effective as of the date of his last removal therefrom. From this judgment the cause was appealed to this court.

Based upon record evidence in the case, the director of the Department of Public Health and Welfare made the following findings of fact:

"George W. Carlisle lives with a daughter in Risco, New Madrid County, Missouri. His wife died March 22, 1955. He collected $2,088.30 from an insurance company for a fire that destroyed the dwelling house where he was living in Risco in September, 1956. Claimant was at the home of a daughter in St. Louis at the time of the fire. He deposited the insurance money in the First National Bank at Wellston, Missouri, in the name of his granddaughter, Joyce A. Stoner, 17 years of age. He received the insurance money in November,

1956. Claimant did not produce the bank statement or cancelled checks showing the disposition of this account but he testified he had withdrawn all the money and that the account has been closed. Claimant contends he paid $529.50 to his daughters, Mrs. Sylvilla Hardin, St. Louis, for money she had loaned him and also $600.25 to Mrs. Stoner, daughter, who also lives in St. Louis for money she had loaned him. According to the evidence submitted these payments were made in cash. These payments were made in November, 1956. No records were kept showing the amount of money loaned or when it was loaned but it was supposed to have been loaned over a period of years. Claimant was removed from the old age assistance rolls in February, 1957, after it was discovered he had received the insurance money and had paid $1,129.75 to his daughters. The evidence submitted it not convincing that claimant was indebted to his daughters. It is found that claimant transferred $1,129.75 to his daughters without receiving a valuable consideration as required by the statute."

The director of Public Health and Welfare made his decision under § 208.010 Laws of Missouri, 1959, V.A.M.S., disqualifying a person to receive benefits who has transferred property within five years prior to the investigation without consideration or inadequate consideration, which section reads:

"2. Benefits shall not be payable to any claimant who:

"(1) (a) Has made, or whose spouse with whom he is living has made, an assignment, conveyance or transfer of real or personal property or any interest therein of any value within five years preceding the date of the investigation without receiving fair and valuable consideration for said property. The date of recording or filing of any instrument affecting property that is assigned, conveyed or transferred by written instrument shall be considered as the date such assignment, conveyance or transfer occurred. '*Fair and valuable con-*

*sideration'* as used herein means money or real or personal property received at the time of the transaction approximately equal to the market value of the property assigned, conveyed or transferred, and shall not for the purpose of this section be construed to include support, services, or other advancements made or to be made by a relative to a claimant. A payment of a loan to a relative may be recognized and eligibility not affected if the claimant can establish to the satisfaction of the division of welfare that the loan was *bona fide* and the proceeds of the loan was used by the claimant for his or his dependents' support or benefit."

We here state the facts as disclosed by the record. George W. Carlisle, claimant, is a resident of New Madrid County, Missouri, living with his daughter-in-law, Juanita Carlisle in Risco. He and his wife resided at this residence for some thirty years. On March 22, 1955, his wife died. In September, 1956, claimant's residence was destroyed by fire and he received $2,-088.35 insurance which he deposited in the First National Bank at Wellston, Missouri, in the name of his granddaughter, Joyce A. Stoner. The evidence shows that out of this insurance money claimant paid certain indebtedness incurred for funeral expenses of his wife and doctor bills for both his wife and himself and for back taxes on the property, leaving a balance of $1,129.75. This money he paid to two of his daughters; to Syvilla Hardin of St. Louis $529.50 cash and to Mrs. Stoner, $600.25. These payments were made in November, 1956.

The evidence shows that in 1951 claimant was placed on old age assistance rolls and in 1952 his wife was placed on the rolls; that together they were paid about $120 a month, this being their only income. In February, 1957, claimant was removed from the old age assistance rolls when it was discovered he had transferred cash to his daughters which had been paid him by the insurance company. Claimant did not appeal from the action taken by the Welfare office in removing him from the old age assistance rolls, but, subsequently, in December, 1957, he filed an application for old age assistance. This application was rejected on the basis that he had transferred cash to his daughters without receiving a valuable consideration.

Claimant testified that prior to his wife's death she had a prolonged illness; that she had been confined in a hospital and every week had to go to the doctor. He testified she first had a stroke of the brain and that they brought her out of that a little but in a couple of years she had another one and that in another two years she had a third stroke from which she died. He gave this testimony:

"Q. And during that time what income were you and your wife receiving? A. We was receiving old age assistance.

"Q. How much was that? A. That was $120 a month.

"Q. Did you and your wife have any income to pay the hospital and doctor bills that were incurred? A. Yes.

"Q. Where did you get the money * * * A. Our two daughters helped us out.

"Q. What two daughters was that? A. Flora Stoner and Syvilla Hardin.

"Q. Do you know how much money that you received from them, Mr. Carlisle? A. Well, not exactly. I figured it as near as I could figure it up and give them $500 and something apiece out of it, of the insurance money, paid it back to them. The agreement was this, when they was letting us have the money along, if we ever sold the place or anything happened to the place, why, we would give them their money back.

"Q. They had not been making you a gift then, is that right? A. No, sir, they wasn't making me a gift. They was helping us."

He identified a receipt, (offered in evidence as plaintiff's exhibit 6), for $529.50,

signed by Carl J. Hardin, husband of Syvilla Hardin, and testified that the receipt was for money that his daughter had paid out for their mother. The receipt reads: "in payment of money loaned him to pay Mrs. Carlisle's medical expenses". Claimant testified that he was out of a home and had no way to pay his bills or expenses, no income whatever and that he was staying with his daughter-in-law and his rent was piling up so bad that she was getting badly dissatisfied. As to the payment of $600.25 to his daughter, Mrs. Stoner, claimant gave this testimony:

"Q. Did you give her the same amount you gave Mrs. Hardin? A. I don't know exactly, but something over $500. She gave me a receipt and it's got misplaced somewhere in my papers going around and around."

On cross-examination claimant gave this evidence:

"Q. You remember coming here to the welfare office in November '55, right after your wife died, and talking with the welfare worker? A. I really don't remember now whether I did or not. I believe I was in here one evening.

"Q. Your wife had died and you brought in some statement showing your indebtedness to Dr. Lange for $38.57. You remember that? A. Yes.

"Q. And Dr. Carlstrom for $14? A. Yes.

"Q. And Watkins funeral home, $599.-50? A. Yes.

"Q. Apparently that is all the debts that you considered you owed at that time, is that right? A. Well, I give them all in at the time just like you have got it here now. That is the way I turned them all in. That is all the receipts I had."

Witness testified he had about $15 or $20 in his pocket; that he had no money in any bank. He gave this evidence:

"Q. When did you close this bank account you had up at St. Louis? A. When I got done settling up these debts."

He testified he had the cancelled checks up in St. Louis; that he had a box there in the closet where he kept them in his daughter's home in St. Louis. He said he did not bring the checks with him; that he had nothing but a suitcase to carry around.

Flora Stoner testified that she is the daughter of George Carlisle and Mary E. Carlisle and lives at 10111 Caryle, Overland 14, St. Louis. She stated:

"Q. Mrs. Stoner, did your mother have a prolonged illness prior to her death? A. Yes, she did.

"Q. How long had she been ill prior to her death? A. Four to five years.

"Q. Did she require treatment for her illness? A. Yes, sir.

"Q. What kind of treatment? A. Well, different kinds. She had strokes."

She stated that her mother was confined in the Missouri Baptist Hospital five to seven days at the time of her death, March 27, 1955. She gave this evidence:

"Q. Mrs. Stoner, did you give your father and mother any financial assistance during the lifetime of your mother? A. Yes, I did.

"Q. What did that assistance amount to? A. Well, around $600, maybe a little more.

"Q. Do you have all the receipts? A. No, sir, I don't.

"Q. Do you have some receipts? A. Well no, not exactly receipts I don't have because I just give him money.

"Q. Did you pay any part of the funeral expenses of your mother? A. Yes, sir, I paid some before his house burned.

"Q. And prior to that you said you had made some payments? A. Yes, sir, I paid for his hospital bills while he was in the hospital and different things."

Witness identified claimant's exhibit 7 (offered in evidence), and testified it was a payment she and her sister helped make on her mother's funeral. She gave this testimony:

"Q. What do you mean 'we helped make.' A. Well, I didn't pay it all. I paid part of it and my sister paid some.

"Q. What sister is that now? A. Mrs. Hardin.

"Q. You know how much you paid and how much she paid? A. No."

Witness testified that she and her sister just paid what they could and she didn't know exactly how much; that the receipt given for the money paid was made to her father, George Carlisle, but that she and her sister made the payment. She stated: "No, we sent him the money and he took it and paid it." The receipt was dated June 19, 1956, and dates on other receipts were August 15, 1955, and April 23, 1955, all of which were made prior to the receiving of the check from the insurance company. She testified she had paid hospital bills for her father after he received the insurance money and after he had repaid her for the money loaned.

Claimant offered exhibits 8, 9, and 10. Witness testified the $25 shown in exhibit 8 was money she paid for her father when they put him in the hospital. This exhibit is dated 3–29–57. She stated she paid the money herself. She testified exhibit 9 was another payment she made while he was in the hospital and that exhibit 10 was a receipt from the hospital, dated 5–1–57, for the balance of her father's bill, paid when she took him out. Witness identified claimant's exhibit 11 and testified that it was a note given by her for unpaid balance of $78.65 on hospital bill of her father. She testified she paid other bills for him, including small amounts for insurance. She gave this testimony:

"Q. How much money, Mrs. Stoner, did you receive from your father after he received his check from the insurance? A. I think it was $600.25."

She testified she gave her father a receipt for this money; that the payment was made in cash. She stated she did not have the cancelled checks for her father's account in the bank; that she did not know exactly the date the bank account was closed out but that it was in the fall of 1957.

On cross-examination witness testified that her husband is employed as a carpenter; that she and her husband have a joint account in St. Johns Bank. She stated she deposited the $600 received from her father. She gave this evidence:

"Q. Now, this money that your father gave you, you considered that in repayment of money that you had let him have, or advanced to him and his wife, is that right, during her lifetime? A. That is right.

"Q. Over what period of time? A. Well, about five years, I would say.

"Q. Do you have any cancelled checks showing that you gave him any money? A. No, sir.

"Q. And he didn't give you any note or anything? A. No, sir.

"Q. You kept no record of it? A. No, I didn't, because I would just give him money, him and her both."

Witness testified that her father was living with her in St. Louis at the time the welfare officer took him off the rolls in February, 1957.

Syvilla Hardin testified that she lives in St. Louis, Missouri, and is the daughter of Mary E. and George W. Carlisle; that her mother died March 22, 1955; that at the time of her death she owned two lots in Risco on which a house and barn were located; that the house burned in 1956 and her father received insurance which was carried on the house. She testified that the amount of money, shown by plaintiff's exhibit 6, was received by her from

her father in cash. She gave this testimony:

"Q. What was that money for? A. Well, actually that was for doctor bills on my mother and daddy and one or two house payments that he had gotten behind on and medicine that Daddy has to have, which he still has to have, which is a bottle about every two weeks.

"Q. How much is that? A. That runs $3.80 a bottle is what that costs.

"Q. Over what period of time did that cover? A. It was a period of about five or six years that run."

Witness testified her mother had been sick six or seven years and that her sickness required assistance of doctors and hospitalization. She testified:

"Q. Who paid those bills? A. My sister and I paid it.

"Q. What sister? A. Flora Stoner."

She testified that she and her sister went half and half on her mother's hospital bill and doctor bills, that is the hospital bill in St. Louis before she died. She said they paid the bills in cash. She gave this testimony:

"Q. Did you pay them yourself? A. Yes, sir.

"Q. Took the money in yourself and paid the hospital? A. Yes, sir."

When asked if she received any receipts for the money so paid, she testified that such receipts were made in her daddy's name. She said she had no receipts from her father to show for the money loaned him. She stated: "No, that was just out of our budget. When he needed it we gave it to him on the basis if he ever got it he would give it back to us." She said that was the understanding because there were eight of the children but only she and her sister, Flora, took care of her father. She stated: "And we loaned it to him on that basis."

Witness testified that the hospital bill of her mother's last sickness, which she and her sister Flora paid, amounted to something over $200. She testified her father paid her $529.50 in cash; that she sent the money to her creditors that she had let get behind because of help rendered her father.

On re-examination witness testified:

"Q. Anyway, that money he gave you was supposed to be in payment for money you had let him have? A. Over a period of five or six years."

She testified that the money was not for her part of the estate but was repayment for money given him and her mother for bills, doctor bills and house payments he had gotten behind, and for medicine and different things; that it was strictly money she and her sister had let him have.

Winston Hall testified on behalf of the Division of Welfare that he was employed as a case worker; that he has the record of George W. Carlisle. This record was obtained as a result of investigation of the application of claimant and was made at the time of the investigation. Referring to this case record it shows that claimant was approved for old age assistance in 1951 and his wife on March 7, 1952; that assistance was received up until the time of his wife's death and claimant continued to receive assistance until February, 1957. A part of this record was prepared by a case worker in St. Louis where the case was closed. The record was returned to New Madrid County when claimant reapplied for old age assistance in December, 1957. Witness testified that the reason for the rejection of claimant's application was "because he was unable to produce verification that he actually owed his two daughters, Mrs. Stoner and Mrs. Hardin, $1129.75."

Witness said that when Mr. Carlisle came to the office in May, 1955, he reported debts of $38.75 to Dr. Lange; Dr. Carlstrom $14, and Watkins Funeral Home $599.50; that at that time he was receiv-

ing old age assistance of $60 per month. Witness said the budget for claimant made November 7, 1955, showed a total need for him of $94.51. Witness gave this evidence:

"Q. As I understand you rejected the application solely on the basis of the information about the disposition of this property? A. That is right. The period of time had not elapsed. That is, the period of time they computed in St. Louis that he would be ineligible had not elapsed when he came back to New Madrid County, and consequently it was rejected for the same reason it was closed."

On cross-examination witness testified that claimant was unable to make satisfactory verification of alleged debts to his daughters. He gave this evidence:

"Q. I understand that. What do you consider satisfactory verification? A. Well, for instance, a receipt from a hospital showing that either one of the daughters, or both of the daughters, paid a certain bill on a certain date.

"Q. Mr. Hall, what would you do in the event a receipt was lost? Would you decide that the debt had never been paid? Would you accept any other evidence other than the receipt? A. Well, an oral statement from, say, the bookkeeper or the administrator of the hospital.

"Q. Would you accept an oral statement from the person who made the payment? A. No, that would not be acceptable, no.

"Q. You don't then consider sworn testimony of an individual as proof or verification? A. We do not."

Appellant relies upon two assignments of error committed by the trial court for reversal of the judgment. First, the court erred in finding that the decision of the director was arbitrary and unreasonable for the reason that such finding was an invasion by the court of the fact-finding duties of the director of the Department of Public Health and Welfare.

Second, that error was committed by the trial court in remanding the cause to the Department of Public Health and Welfare with directions that claimant be restored to old age assistance rolls effective as of the date of his last removal therefrom, because the court was without authority to restore the claimant to such rolls.

The cause is submitted to this court upon the brief of appellant, respondent having failed to file a brief.

Claimant applied for old age assistance benefits December 2, 1957. His application was rejected February 19, 1958, on the basis that he had transferred cash to each of his daughters without receiving a valuable consideration as required by statute.

Claimant's position is that the money transferred to his daughters was in payment of loans received from them and used for support of himself and wife.

Section 208.010, 2(1) (a) V.A.M.S., provides: " * * * A payment of a loan to a relative may be recognized and eligibility not affected if the claimant can establish to the satisfaction of the division of welfare that the loan was *bona fide* and the proceeds of the loan was used by the claimant for his or his dependents' support or benefit."

■ The burden was on claimant to establish eligibility for old age assistance. Johnson v. State Department of Public Health and Welfare, Mo.App., 283 S.W.2d 147, 148 [1–4]; Humphrey v. State Department of Public Health and Welfare, Mo. App., 286 S.W.2d 563; Choate v. State Department of Public Health and Welfare, Mo.App., 296 S.W.2d 189; Bollinger v. State Department of Public Health and Welfare, Mo.App., 254 S.W.2d 257, 259 [1, 2].

Scope of review on appeal in old age assistance cases is set forth in § 208.100 subd. 5, as follows: "Upon the record so certified by the director of public health and welfare, the circuit court shall deter-

mine whether or not a fair hearing has been granted the applicant. If the court shall decide for any reason that a fair hearing and determination of the applicant's eligibility and rights under this law was not granted the individual by said director, or that his decision was arbitrary and unreasonable, the court in such event shall remand the proceedings for redetermination of the issues by said director."

■ A decision of a director of State Department of Public Health and Welfare denying an application for old age assistance is binding upon the court of appeals if there is substantial evidence to support it, even though such court might have decided matters differently upon the same evidence. Bollinger v. State Department of Public Health and Welfare, Mo.App., 254 S.W.2d 257, 259 [1, 2].

There is no contention made here that a fair trial was not granted applicant. He was represented by counsel, was permitted to call witnesses and to cross-examine witnesses on the part of appellant.

The sole question presented is whether or not the decision of Public Health and Welfare was arbitrary and unreasonable.

The Supreme Court, en banc, in Howlett v. Social Security Commission, 347 Mo. 784, 149 S.W.2d 806, 809, 810 [7, 8] stated: "* * * But if the ultimate decision of the commission is not based upon substantial evidence, the finding must be characterized as arbitrary and unreasonable and the determination reversed. The rendition of such a judgment would constitute no invasion of the statutory fact-finding power of the commission, because the court would not be making a finding of fact; it would be merely reviewing a question of law. Kristanik v. Chevrolet Motor Co., en banc, 335 Mo. 60, 70 S.W.2d 890." Sullivan v. State Department of Public Health and Welfare, Mo.App., 295 S.W.2d 190; Collins v. Division of Wefare, 364 Mo. 1032, 270 S.W.2d 817, 819 [2].

■ In determining whether the record discloses substantial evidence to support the decision of the director of the Department of Public Health and Welfare, we may consider only testimony most favorable to support the decision. Bollinger v. State Department of Public Health and Welfare, supra.

■ Substantial evidence is that evidence which, if true, has probative force upon the issues and from which the trier of fact can reasonably decide the case on the fact issues. Collins v. Division of Welfare, 364 Mo. 1032, 270 S.W.2d 817; Cupples Hesse Corp. v. State Tax Commission, Mo.Sup., 329 S.W.2d 696, 702 [13, 16]; Davis v. State Department of Public Health and Welfare, Mo.App., 274 S.W.2d 615, 617 [6].

In Collins v. Division of Welfare, supra, 270 S.W.2d at page 820, Judge Conkling, speaking for the court, stated: "In considering whether there is any substantial evidence of record to support the Director's findings and order, an appellate court as a matter of law passes only upon the matters of substance. Questions concerning credibility of witnesses or the weight of the evidence are not before us upon this appeal. 'Substantial evidence' is evidence which, if true, has probative force upon the issues, i. e., evidence favoring facts which are such that reasonable men may differ as to whether it establishes them; it is evidence from which the trier or triers of the fact reasonably could find the issues in harmony therewith; it is evidence of a character sufficiently substantial to warrant the trier of facts in finding from it the facts, to establish which the evidence was introduced. State v. Miller, Mo.Sup., 202 S.W.2d 887, 889; Berkemeier v. Reller, 317 Mo. 614, 296 S.W. 739, 752; State v. Gregory, 339 Mo. 133, 96 S.W.2d 47, 51, 52."

In Ellis v. State Department of Public Health and Welfare, Mo.App., 277 S.W.2d 331, 335 [5–7], our court stated: "The re-

ception of evidence in such hearings should be governed by the same rules as are followed in the courts [Burley v. State Social Security Commission, 236 Mo.App. 930, 163 S.W.2d 95, 96(5)], particularly so in view of the fact that Rule 30 of the Division filed in the office of the Secretary of State on January 26, 1951 [Section 356.020(1)] provides that 'the rules of evidence as applied to civil cases in the State of Missouri shall be applied.' * * *" Ellis v. State Department of Public Health and Welfare, 365 Mo. 614, 285 S.W.2d 634.

We held in Norman v. State Department of Public Health and Welfare, Mo.App., 283 S.W.2d 143, 146 [4, 6] that: "Furthermore, any fact-finding administrative agency, such as the Department, which passes upon the credibility of the witnesses, may decide a claim solely upon a finding of lack of credibility." See authorities cited.

■ Following the law as declared above, we find that there was substantial evidence to support the finding and judgment of the director of Public Health and Welfare denying claimant's application for old age assistance on the ground that he transferred $1,129.75 to his daughters without receiving a valuable consideration as required by statute. It is admitted that claimant transferred said amount to his daughters and the evidence submitted by him does not sustain the burden of proof which is convincing that claimant was indebted to said daughters. Claimant testified that he kept no record of monies loaned to him by his daughters, he did not know the amount so loaned, and, actually, did not know the amounts he transferred to them. The daughter's testimony as to loans made to claimant over a period of years were made without receiving receipts therefor, no records kept and their testimony was indefinite as to the exact amounts furnished. We find that the trial court erred in his judgment finding that the decision of the director of Public Health and Welfare was not supported by substantial evidence, and, therefore, arbitrary and unreasonable.

■ The second alleged error is well taken. The trial court was without authority to order claimant restored to old age assistance rolls effective as of the date of his last removal therefrom. Section 208.100, subd. 5, RSMo 1949; V.A.M.S.; Foster v. State Social Security Commission, Mo.App., 187 S.W.2d 870, 872 [1, 2]; Thornsberry v. State Department of Public Health and Welfare, 365 Mo. 1217, 295 S.W.2d 372, 374 [2, 3].

The circuit court should not order applicant reinstated on the rolls of the commission for the reason that such order was an invasion of the exclusive jurisdiction of the commission and its right to weigh the evidence. The cause should be remanded to the commission for the determination of the issues by the commission. Rosebraugh v. State Social Security Commission, Mo. App., 196 S.W.2d 27.

Judgment reversed and remanded with directions that judgment of the trial court be set aside and judgment entered affirming the order and judgment of the director of State Department of Public Health and Welfare.

STONE, P. J., concurs.

RUARK, Judge.

I concur in the opinion of Judge Mc-DOWELL because the evidence in regard to whether the money advanced by the daughters was in the way of gifts or loans was susceptible of different interpretations and conclusions by reasonable men. I do not, however, wish my concurrence to be taken as any concurrence in or agreement to the policy as testified by the casework supervisor for the Division of Welfare to the effect that payments made by relatives can be supported by documentary evidence or verification by third persons, but that the testimony of the person making the payment would not be considered as proof.

Although the act places the power of complete factual determination in the Divi-

sion, I think it does not grant to the Division or its supervisors the arbitrary power to cast aside and refuse to consider as proof the testimony of relatives, interested or otherwise. The fact that some persons, perhaps out of motives of filial love and devotion, have come to the rescue of the needy aged and infirm when no one else would do so does not automatically place such relatives in the class of liars and perjurers whose testimony is not worthy of consideration. Any finding based upon such a policy would be arbitrary, for their testimony is entitled to be considered and weighed. But since it is not shown that in its ultimate decision the Division did so arbitrarily exclude and refuse to consider such evidence, I must concur.