**Ellie Marie GARRARD, Claimant-Appellant,**

v.

**STATE DEPARTMENT OF PUBLIC HEALTH AND WELFARE,**
**Defendant-Respondent.**

No. 8202.

Springfield Court of Appeals.

Missouri.

Jan. 6, 1964.

Motion for Rehearing or to Transfer

Overruled Feb. 27, 1964.

Cable & Stephenson, Kennett, for claimant-appellant.

Elmore G. Crowe, Edward D. Summers, Jefferson City, for defendant-respondent.

STONE, Judge.

Ellie Marie Garrard (hereinafter called claimant), who had been receiving aid to dependent children (hereinafter referred to as ADC) under Section 208.040,[1] was removed from the rolls on September 15, 1961, by the Division of Welfare (hereinafter called the Division) because, on re-investigation of the case, the "medical review team" in Jefferson City concluded that the two children born to and residing with claimant and her husband, William Grady Garrard (hereinafter called Grady), were no longer deprived of parental support and care by reason of his physical incapacity. Claimant duly appealed to the Director of the Department of Public Health and Welfare, a hearing thereafter was conducted

by a referee, and upon the record then made the Director found that "while claimant's husband [Grady] may have some disabilities he does not have such a physical or mental defect, illness or disability that prevents him from performing any gainful work" and that, "therefore, claimant is, at this time, ineligible for Aid to Dependent Children benefits." Sec. 208.080. On subsequent appeal, the circuit court affirmed the Director's decision. Sec. 208.100. Still complaining, claimant brings the case to us.

Only two questions were, or properly could have been, presented to the circuit court, i. e., whether a fair hearing was granted to claimant and whether the Director's decision was arbitrary and unreasonable [Sec. 208.100(5)]; and we are limited to the same two questions, both of which have been briefed and argued here. Powers v. State Dept. of Public Health & Welfare, Mo.App., 359 S.W.2d 23, 25(1).

In support of her point that she was denied a fair hearing, claimant complains (1) that her counsel "was deprived of the right of examining a witness from a certain document purported to be that witnesses' (sic) report," (2) that inadmissible evidence and exhibits were received over objection, and (3) that the referee indicated "by certain remarks and questions" bias and prejudice against claimant. We treat of these seriatim.

The "certain document" mentioned in the *first complaint* was a medical report (on a Division form) dated January 6, 1961, by Dr. R. L. Palenske, Grady's physician since 1955 and a witness for *claimant*. In the course of this witness' examination by the referee, Dr. Palenske

---

1. Except as otherwise specifically stated, all statutory references are to RSMo 1959, V.A.M.S. That portion of Section 208.040, pertinent to determination of the instant case, reads as follows: "Aid to dependent children shall be granted on behalf of a dependent child or children and may be granted to a mother * * * caring for a dependent child or children who: * * * (2) Has been deprived of parental support or care by reason of the * * * physical or mental incapacity of a parent * * *. Benefits may be granted and continued for this reason only while it is the judgment of the division of welfare that a physical or mental defect, illness or disability exists which prevents the parent from performing any gainful work."

had confirmed the authenticity of the report and it had been identified as Division's Exhibit 1. After the referee's examination had been concluded, claimant's counsel put two additional questions to Dr. Palenske, neither of which referred to Exhibit 1, and the referee returned with another question, likewise unrelated to that exhibit. With no recess indicated, the transcript then shows that the referee offered Exhibit 1 and that claimant's counsel responded: "I am going to, as a matter of course, object to the admission of this since I didn't get my hands on it until the doctor left." But the statement of counsel, not sworn as a witness, did not prove itself or constitute evidence. City of Rolla v. Riden, Mo.App., 349 S.W.2d 255, 257; Wilson v. Motors Insurance Corp., Mo.App., 349 S.W.2d 250, 254(4); Engle v. Ferrell, 126 Mo.App. 577, 581, 105 S.W. 23, 24(5). And the transcript, which we must take as it comes to us [Bennett v. Wood, Mo., 239 S.W.2d 325, 327(2); Miller v. Dowling, Mo.App., 360 S.W.2d 345, 348(3); Baker v. Missouri National Life Ins. Co., Mo.App., 372 S.W. 2d 147, 155(11)], otherwise does not show either that Dr. Palenske had left before Exhibit 1 was offered or that claimant's counsel theretofore had made any effort whatever to "get my hands on it."

The *second complaint* is directed to (a) leading questions by the referee to witness Glass, a caseworker, and (b) the admission in evidence of Division's Exhibits 2, 3 and 4. As to the complaint about leading questions, examination of the transcript discloses that claimant's counsel objected to only one question put to witness Glass and that question was not answered. Even in appellate review of a jury-tried civil case, we would accord no consideration to a belated objection, first interposed here, to the form of questions propounded upon trial. Cf. Faught v. Washam, Mo., 329 S.W.2d 588, 599(17); Stanziale v. Musick, Mo., 370 S.W.2d 261, 266(6). Certainly we should not be more critical of the conduct of an administrative hearing, particularly with respect to a matter, such as leading questions, so frequently found in contested procedures.

Turning to the exhibits, we find that Exhibit 2 purported to be an unsigned copy of a medical report dated August 14, 1961, from Dr. Charles F. Wilson of Cape Girardeau, to whom Grady had been directed by the Division for examination; that Exhibit 3 was a two-page unsigned "social information summary" which, on the second page, included the finding of the "medical review team" in Jefferson City; and that Exhibit 4 purported to be a six-page unsigned report from the Veterans Administration Hospital at Memphis, Tennessee, where Grady had been confined for observation and examination from June 3 to July 1, 1961. The reception of evidence in hearings of this character should be governed by the rules of evidence as applied in civil cases [Ellis v. State Dept. of Public Health & Welfare, 365 Mo. 614, 622, 285 S.W.2d 634, 640(7), affirming Mo.App., 277 S.W.2d 331, 335(5); Burley v. State Social Security Com'n., 236 Mo.App. 930, 163 S.W.2d 95, 96(5)], excepting insofar as such rules may be modified and relaxed by permissible legislative enactments. See Sec. 208.075, RSMo 1963 Supp.; Sec. 536.-070. Exhibit 3 clearly was an inadmissible document. Ellis, supra, 365 Mo. loc. cit. 622, 285 S.W.2d loc. cit. 640. Although upon rehearing the *signed* medical report of Dr. Wilson would be admissible [Sec. 208.075, RSMo 1963 Supp.] and the report from the Veterans Administration Hospital might, upon a proper showing, become admissible under the Uniform Business Records as Evidence Law [Secs. 490.660 to 490.690; Ellis, supra, 365 Mo. loc. cit. 624–625, 285 S.W.2d loc. cit. 641–642], there is no doubt but that Exhibits 2 and 4 should not have been admitted upon the record before us. Ellis, supra; Barnes v. State Dept. of Public Health & Welfare, Mo. App., 320 S.W.2d 88, 91(3). In fact, capable counsel for the Department frankly so recognize in their brief, insisting, however, that the Director's decision "clearly shows that it was based upon the competent

and admissible medical testimony in the record, namely, the testimony of Dr. R. L. Palenske." But, regardless of whether the Director considered these exhibits, their erroneous reception in evidence did not, in and of itself, demonstrate that claimant was not granted "a fair hearing" within the contemplation and meaning of Section 208.100(5). And upon judicial review "the court, as authorized in all nonjury cases by Section 510.310 [now Civil Rule 73.01, V.A.M.R.], will consider all the evidence duly preserved (whether admitted or not), which it finds to be admissible, and decide the case on such evidence." Ellis, supra, 365 Mo. loc. cit. 624, 285 S.W.2d loc. cit. 641(17).

■ In presenting the *third complaint*, claimant's counsel direct attention to four leading questions by the referee (to no one of which was an objection interposed) and to the referee's comment, "I believe that is too remote," with respect to the testimony of a lay witness that, while Grady had been plowing cotton four or five years before the date of hearing, "he had some kind of a spell." Relying upon Jones v. State Dept. of Public Health & Welfare, Mo.App., 354 S.W.2d 37, counsel contend that, in the aforesaid particulars, the referee "displayed bias and prejudice" against claimant who thereby "was denied a fair hearing and determination." We are in entire accord with the observations and holding in Jones, supra; but in that case the referee had made statements which manifested his bias against claimant, amounted to "an openly expressed pre-judgment of the controversy," tended to intimidate claimant's husband (the allegedly incapacitated parent), and had the effect of disparaging and discrediting not only his testimony but also that of all witnesses who testified to his incapacity. [354 S.W. 2d loc. cit. 40–41] However, the same vices do not inhere in the four leading questions and the single comment, which counsel for instant claimant deplore, and those questions and comment neither manifest the same purpose nor work the same result

as did the referee's statements in Jones, supra. We are of the considered opinion that claimant was accorded a fair hearing. Davis v. State Dept. of Public Health & Welfare, Mo.App., 274 S.W.2d 615, 616(2) ; McCoy v. State Dept. of Public Health & Welfare, Mo.App., 271 S.W.2d 788, 790; Bollinger v. State Dept. of Public Health & Welfare, Mo.App., 254 S.W.2d 257, 259(4).

■ We pass to claimant's second point, i. e., that the Director's decision was arbitrary and unreasonable. Otherwise stated, the issue is whether the decision was based upon substantial evidence. Ellis, supra, 365 Mo. loc. cit. 618, 285 S.W.2d loc. cit. 637(2) ; Howlett v. State Social Security Com'n., 347 Mo. 784, 789, 149 S.W.2d 806, 810; Davis, supra, 274 S.W.2d loc. cit. 617 (3, 6). If it was, it may not be disturbed, even though we might have reached the opposite conclusion upon the same evidence. Collins v. Division of Welfare, 364 Mo. 1032, 1037, 270 S.W.2d 817, 820(4); Dysart v. State Dept. of Public Health & Welfare, Mo. App., 361 S.W.2d 347, 350(1); Morton v. State Social Security Com'n., Mo.App., 205 S.W.2d 272, 274(5).

At the date of hearing, to wit, on February 8, 1962, Grady was thirty-five years of age. His formal education terminated at the sixth grade. "A long time ago" he did "sawmill work and everything—trucking." In 1952 he entered military service but three months and ten days later was discharged (so he said) for rheumatic heart disease. During the period from the date of his military discharge to the date of hearing, Grady chopped some cotton, plowed a few days, and from October 1960 to May 1961 "fished commercially" on the St. Francis River—a pursuit in which a vocational rehabilitation agency had interested him. Grady testified that he had quit commercial fishing in May 1961 because of his physical condition, although cessation of that "work" curiously coincided with the theft of his boat and liveboxes.

Grady's categorical denial that he was "able to work and make a living" was predicated on a comprehensive collection of complaints and conditions. He said that even work no heavier than helping his wife (claimant herein) around the house brought on "spells" or "attacks," when he would "get short of breath" and "my heart would just beat so hard and skip beats I would just have to quit." When one of these "spells" begins, "I always just have to sit down; if I am near the house, I generally lay (sic) down * * * it will leave me quicker that way." His back "has been bothering * * * for I don't know exactly how long. * * * I just get to hurting so bad I can't hardly stand it, and I get sore and stay sore in my back all the time." At another point in his testimony, Grady complained that "I get sore all in my left side and shoulder." At still another point, he said that "I have to really be careful with my stomach; I have gastric hemorrhages * * *." An accident in 1942, in which he suffered a fractured right elbow, has left him with "a crippled arm" and fingers (on that hand) which "he doesn't straighten * * * out very well," although Grady conceded that this condition does not prevent him from working. When asked by the referee "how much of the time" he could work, Grady thought "thirty per cent, probably"; but he shortly explained that was "an overall average" reflecting the "times I can go out there and work until I do have an attack * * * I just couldn't work no certain set time." "I might work an hour or two and have one [an attack], and then I might work a half a day, but I am sure to have one when I work."

Claimant's counsel concede that, *if* Division's Exhibit 2 (the purported medical report dated August 14, 1961, from Dr. Charles F. Wilson) and Division's Exhibit 4 (the purported report from the Veterans Administration Hospital at Memphis) had constituted competent evidence, those exhibits would have afforded substantial support for the Director's findings. But claimant's counsel insist, opposing counsel recog-

nize, and we agree that Exhibits 2 and 4 were inadmissible upon the record before us. However, counsel for the Department assure us that "the Director did not consider the inadmissible medical reports [Exhibits 2 and 4]" and assert that "the decision rendered by the Director clearly shows that it was based upon the competent and admissible medical testimony in the record, namely, the testimony of Dr. R. L. Palenske," a medical doctor and the only medical witness.

For seven years prior to the date of hearing, Dr. Palenske had practiced at Hornersville in Dunklin County and, during that entire period, claimant had called on the doctor "pretty regular." Dr. Palenske testified that Grady "has a chronic bronchitis with emphysema"—"recurrent episodes, which are getting more frequent, of a cough and chest pains," an enlarged heart with "a grade 2 apical murmur"—"I am not quite sure of what kind of a heart condition he has," and "scoliosis—pain in his back—which is a compensatory difficulty which has arisen from his chest condition." Grady had no fever when examined on the day before the hearing, but the doctor added that "he [Grady] usually runs about half degree to one degree of temperature." His pulse rate on the day before the hearing was 104, substantially faster than the normal rate for one of his age. "On any kind of exertion, the [heart] murmur is accentuated and it just speeds up."

The Department here emphasizes Dr. Palenske's statement that Grady could do "light work." In the doctor's language "he can work at small tasks such as, you know, light work * * * he could sit at a machine perhaps and do all right if there was no dust in the room and the temperature was just right." But the quoted statement and Dr. Palenske's further agreement with the referee's leading "question" that "there would be many jobs he [Grady] could do" must be read and considered in context. Except for his brief try at commercial fishing—a pursuit which Dr. Palenske characterized as "the worst thing he could have

done because he * * * got chilled and wet," Grady had done nothing other than manual labor; and, with only a sixth-grade education and no vocational training or experience, he was equipped and prepared for nothing else. So it was that, when Dr. Palenske agreed with the referee that "there would be many jobs he could do," the doctor quickly added, "I don't know of any around here"; and, when asked for his opinion on the determinative question, i. e., whether Grady was "capable of performing gainful employment," the doctor said: "Not the kind of gainful employment that he would have to do because of his— let me rephrase that—he is not capable of doing hard manual labor. He is not capable of holding a job because of his condition, which constantly recurs, this chest condition, the infection due to the chronic bronchitis, and because of his heart condition, which of course both of them together add up, and they are gradually getting worse all the time."

The Department here relies upon the limitation in the last sentence of paragraph (2) of Section 208.040: "Benefits may be granted and continued for this reason [i. e., for physical or mental incapacity] only while it is the judgment of the division of welfare that a physical or mental defect, illness or disability exists which prevents the parent from performing *any gainful work*." (All emphasis herein is ours.) Substitution of *"any gainful work"* for *"any substantially gainful activity"* was one of several changes in Section 208.040 effected by legislative amendment in 1955. Laws of 1955, p. 691. Emphasizing the rule (one of many bearing upon statutory construction) that, in construing an amended statute, the judiciary should proceed on the theory that the General Assembly intended to accomplish something by the amendment [State v. Chadeayne, Mo. (banc), 323 S.W.2d 680, 684(2); St. Charles Bldg. & Loan Ass'n. v. Webb, Mo., 229 S.W.2d 577, 581(5); State ex rel. Klein v. Hughes, 351 Mo. 651, 656, 173 S.W.2d 877, 880(6)], counsel for the Department argue that, by

the amendment under consideration, the General Assembly "recognized the difficulties in administering the public assistance law in determining what constituted 'any substantially gainful activity' and restricted payment of benefits to persons who were prevented from performing 'any gainful work' "; and, citing cases involving the construction of other statutes in which the word "any" was not modified by the context and was held to be "all comprehensive" [Wormington v. City of Monett, 356 Mo. 875, 881, 204 S.W.2d 264, 267(2); Dohring v. Kansas City, 228 Mo.App. 519, 523, 71 S.W.2d 170, 172], counsel contend for a strict construction of the above-quoted limitation in Section 208.040.

Undoubtedly it is still true, as it was prior to the 1955 amendment, that "it is the physical ability of the parent to work and not what he actually earns that is the decisive factor" in determining whether a parent is physically incapacitated within the contemplation and meaning of Section 208.040. Ellis, supra, 365 Mo. loc. cit. 618, 285 S.W.2d loc. cit. 637(1). And it may be that, by substitution of "any gainful work" for "any substantially gainful activity," the General Assembly intended to authorize the Division to examine more critically and to rule more strictly applications for ADC benefits predicated upon the alleged physical or mental incapacity of a parent. Even so, it does not follow that the statutory limitation, as amended, should be accorded a strict, harsh and unyielding construction, contrary to the general rule that relief statutes are to be construed liberally [81 C.J.S., Social Security and Public Welfare, § 3, p. 10] with a view to combating the evil sought to be eradicated and furthering the remedy provided for that purpose. Cf. Galvin v. State Social Security Com'n. of Missouri, Mo.App., 129 S.W.2d 1051, 1053(3).

The primary rule of statutory construction, which underlies all others, is to ascertain and give effect to the legislative intent [State on inf. of Dalton v.

Miles Laboratories, 365 Mo. 350, 365, 282 S.W.2d 564, 573(13); McCord v. Missouri Crooked River Backwater Levee Dist. of Ray County, Mo., 295 S.W.2d 42, 45(2); Taney County v. Empire Dist. Elec. Co., Mo., 309 S.W.2d 610, 614]; and there is a plethora of authority to the effect that, in the judicial endeavor to ascertain such intent, one of the important factors for consideration is the purpose or objective of the enactment. E. g., State ex rel. Gerber v. Mayfield, 365 Mo. 255, 259, 281 S.W.2d 295, 297(3); In re Duren, 355 Mo. 1222, 1235, 200 S.W.2d 343, 352(8), 170 A.L.R. 391; Globe-Democrat Pub. Co. v. Industrial Com'n. of Missouri, Mo.App., 301 S.W.2d 846, 852(4); Willis v. American National Life Ins. Co., Mo.App., 287 S.W.2d 98, 104(8); Wellston Fire Protection Dist. of St. Louis County v. State Bank & Trust Co. of Wellston, Mo.App., 282 S.W.2d 171, 174(4). As our Supreme Court, en banc, sagely observed in State ex inf. Kamp ex rel. Rodgers v. Pretended Cons. School Dist. No. 1 of Montgomery County, 359 Mo. 639, 645, 223 S.W.2d 484, 488, where it was "candidly stated that a literal, 'according to the letter,' application" of the statutory provision there under consideration would have rendered the consolidation of certain school districts illegal and void: "We may not capriciously ignore the plain language of the statute but in determining what the language really means we may consider the entire purpose and policy of the statute and 'the language in the totality of the enactment' and construe it in the light of 'what is below the surface of the words and yet fairly a part of them.'" See also State ex rel. Henderson v. Proctor, Mo. (banc), 361 S.W.2d 802, 805(1).

In some instances, "the meaning of the questioned words cannot be determined independent of the particular context in which they are used and the subject matter under discussion." Union Electric Co. v. Morris, 359 Mo. 564, 569, 222 S.W.2d 767, 770; Household Finance Corp. v. Robertson, Mo. (banc), 364 S.W.2d 595, 602. See also State v. Bern, Mo.App., 322 S.W.2d 175, 177(2). And, "'if a statute is susceptible of more than one construction, it must be given that which will best effect its purpose rather than one which would defeat it, even though such construction is not within the strict literal interpretation of the statute * * *.'" Household Finance Corp., supra, 364 S.W.2d loc. cit. 602(6).

We also remain mindful of other rules, namely, that the law favors a statutory construction tending to harmonize with reason, give meaning to the enactment, and avoid an unjust or absurd result [Laclede Gas Co. v. City of St. Louis, 363 Mo. 842, 848, 253 S.W.2d 832, 835(3); Owen v. Riffie, Mo., 323 S.W.2d 765, 770; In re H— S—, 236 Mo.App. 1296, 1301, 165 S.W.2d 300, 302(3); Globe-Democrat Pub. Co., supra, 301 S.W.2d loc. cit. 852(5); State v. Bern, supra, 322 S.W.2d loc. cit. 177(4)], and that statutes in pari materia should be construed together and harmonized, insofar as reasonably possible. See cases collated in 26 West's Missouri Digest, Statutes, Key No. 223.2.

The history of ADC legislation indicates enactment thereof for the primary purpose of preserving family unity, keeping dependent children in their own homes, and thereby enabling them to be reared in that atmosphere. Merced County v. Dept. of Social Welfare, 148 Cal.App.2d 540, 307 P.2d 46, 47(1); Town of Cohasset v. Town of Scituate, 309 Mass. 402, 34 N.E.2d 699, 703(2); Crowley v. Bressler, 181 Misc. 59, 41 N.Y.S.2d 441, 445(2); 81 C.J.S., Social Security and Public Welfare, § 63, p. 101; id., § 64, loc. cit. 103. But a literal interpretation of the words "any gainful work" in Section 208.040(2) would encompass such situations as the sidewalk vending of newspapers, brooms, pencils or shoestrings, would require a state of near-helplessness for physical or mental incapacity under that statute [cf. Wiener v. Mutual Life Ins. Co. of New York, 352 Mo. 673, 679, 179 S.W.2d 39, 42(5); Gibson v. Equitable Life Assur. Soc. of the United States, 84 Utah 452, 36 P.2d 105, 109; Cacic v. Slo-

venska Narodna Podporna Jednota, 102 Mont. 438, 59 P.2d 910, 913] and, in inescapable effect, would severely hamper and hinder, if not altogether preclude and prevent, attainment of the legislative purpose.

Furthermore, a literal interpretation of "any gainful work" in Section 208.040(2) would not harmonize with the language and intendment of Section 208.050 which denies ADC benefits to children whose parents are "able-bodied" or "employable": "Aid to dependent children benefits shall not be granted or continued with respect to any child * * * (2) Who is living in the home with a parent and step-parent, both of whom are able-bodied; (3) Whose parent with whom he is living, if employable, refuses to accept available employment. The determination of employability and the conditions under which employment shall be required shall be made by the division of welfare by taking into consideration all the facts and circumstances in the individual case. * * *"

The opinion in Ellis, supra, clearly reflected the judgment of the Division, prior to the 1955 amendment of Section 208.040 (2), as to what then was required to discontinue ADC benefits, to wit, a form "certification" from a medical examiner that "'this person does not have a physical or mental disability which renders him incapacitated to work in the usual manner at any occupation for which his age, training, experience, or education would fit him.'" [365 Mo. loc. cit. 621, 622, 285 S.W.2d loc. cit. 639, 640] Obviously, the quoted language of that form did not reflect a literal, "according to the letter," interpretation of the words "any substantially gainful activity" in the then statutory requirement for physical or mental incapacity, namely, "a physical or mental defect, illness or disability * * * which prevents the parent from performing any substantially gainful activity." Sec. 208.040(2), as amended Laws of 1951, p. 755. We are no more inclined to interpret literally, "according to the letter," the words "any gainful work" substituted in the 1955 amendment. Laws of 1955, p. 691. In this connection, see particularly Barnes, supra, 320 S.W.2d loc. cit. 90, where, subsequent to the 1955 amendment, the court stated that "the evidence on behalf of plaintiff established, prima facie, that he was physically incapacitated for manual labor—the only character of work he was fitted to do" and that "if plaintiff's evidence is all of the competent evidence in the case (that is, admissible evidence) then the Director acted arbitrarily in denying the application * * *."

Certainly, on the admissible evidence in the instant transcript it reasonably could not be said that Grady was "able-bodied" or "employable" [Sec. 208.050] in any fair, equitable or practical sense of either term; and nothing short of a literal, "according to the letter," interpretation of "any gainful work"—an interpretation which we are unwilling to accord—reasonably would have permitted the Director's findings and order on the admissible evidence before him. In this state of the record, the order under review was not supported by competent substantial evidence and thus was arbitrary and unreasonable. Barnes, supra; Ellis, supra.

The judgment of the circuit court affirming the Director's order is set aside and the cause is remanded to the circuit court with directions to remand the cause to the Director of the Department of Public Health and Welfare for redetermination of the issues.

RUARK, P. J., and HOGAN, J., concur.

On Motion for Rehearing
or to Transfer

STONE, Judge.

The burden of the Department's motion for rehearing or to transfer is (1) that we "weighed the evidence, disregarded the findings made by the Director upon substantial evidence and determined independently which way the evidence preponderates," thus erroneously reviewing the

case under Article V, Section 22, Mo. Const. of 1945, 2 V.A.M.S., and (2) that we have read the words "any gainful work" out of Section 208.040(2) and have held "that a person had to be employable or able-bodied to be denied" ADC benefits.

 *As to the first complaint:* We have been mindful that our review in this category of cases is *not* under Article V, Section 22, Mo.Const. of 1945 [Ellis v. State Dept. of Public Health & Welfare, 365 Mo. 614, 618–620, 285 S.W.2d 634, 637–638(3)], and we stated in our opinion, precisely as the Department now urges, that: " * * * [T]he issue is whether the decision was based upon substantial evidence. (Citing cases) If it was, it may not be disturbed * * *." The Department's first complaint manifestly stems from apparent misconceptions (a) as to what constitutes *substantial evidence* and (b) as to whether the testimony of Dr. Palenske supplied the *substantial evidence* essential to support the Director's decision.

 In the course of offering extended advice, no doubt well-intentioned even though self-serving, as to what an opinion in this character of case should contain, the Department's counsel admonish: "The court should consider or quote in its decision the evidence that supports the decision and *then determine whether the evidence is substantial in the sense that it is admissible and competent* without regard to all the opposing or unfavorable evidence submitted." (All emphasis herein is ours.) But *substantiality* is not synonymous with and limited to, but implies and requires something more than, mere *admissibility* and *competency*. As our Supreme Court, en banc, per Conkling, C. J., said in Collins v. Division of Welfare, 364 Mo. 1032, 1037, 270 S.W.2d 817, 820(6): " 'Substantial evidence' is evidence which, if true, has probative force upon the issues, i. e., evidence favoring facts which are such that reasonable men may differ as to whether it establishes them; it is evidence from which the trier or triers of the fact reason-

ably could find the issues in harmony therewith; it is evidence of a character sufficiently substantial to warrant the trier of facts in finding from it the facts, to establish which the evidence was introduced." To the same effect, see Davis v. State Dept. of Public Health & Welfare, Mo.App., 274 S.W.2d 615, 617(6); Burrows v. County Court of Carter County, Mo.App., 308 S.W. 2d 299, 305; Carlisle v. State Dept. of Public Health & Welfare, Mo.App., 341 S.W.2d 617, 624(4); Velghe v. State Dept. of Public Health & Welfare, Mo.App., 362 S.W.2d 747, 750(3).

 With assurances that the Director had *not* considered the inadmissible exhibits, the Department's brief told us that the Director's decision "clearly shows that it was based upon the competent and admissible medical testimony in the record, namely, the testimony of Dr. R. L. Palenske." Thus directed to Dr. Palenske's testimony as supplying the *substantial evidence* essential to support the Director's decision (and indeed no other admissible evidence in the record could have supported it), we carefully considered and painstakingly analyzed the doctor's testimony. Certain bits or fragments of that testimony (noted in our opinion), *if isolated and accepted out of context* (as we are urged to take them), *might* afford support for the Director's decision. But, where the testimony of a witness is not self-contradictory, and Dr. Palenske's testimony was not [contrast Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, 647(6); Banty v. City of Sedalia, Mo.App., 120 S.W.2d 59, 61(1)], *it should be considered as a whole.* Dimond v. Terminal R. R. Ass'n. of St. Louis, 346 Mo. 333, 353, 141 S.W.2d 789, 799(12); Haire v. Stagner, Mo.App., 356 S.W.2d 305, 310; Dugan v. Rippee, Mo.App., 278 S.W. 2d 812, 816(7); 32 C.J.S., Evidence, § 1031a, loc. cit. 1073. See also Batson v. Ormsbee, Mo.App., 304 S.W.2d 680, 682; Hoffman v. Illinois Terminal R. Co., Mo. App., 274 S.W.2d 591, 593. "For sometimes the meaning of the words or the thought attempted to be conveyed by the

witness may be explained and clarified in the words he used or by what he previously [or thereafter] said in relation to the same subject." Hampton v. Raines, Mo.App., 334 S.W.2d 372, 377(5).

When read as a whole, the clear and unmistakable gist and import of Dr. Palenske's testimony was that, although Grady could do "light work" under ideal conditions, the doctor knew of nothing in that territorial area which would be within the physical capability of Grady, also limited as he was by only a sixth-grade education and no vocational training or experience; that "on any kind of exertion" his heart murmur was accentuated; that, if Grady undertook "any kind of hard work," it would make his "chest condition" worse; and that, in short, he was not physically capable of working at hard manual labor, the only "kind of gainful employment" for which he otherwise was fitted. As Dr. Palenske put it, "I am sure maybe he would work 30 minutes, or could, but this hard labor would go ahead and cause a deterioration in his condition quicker, which is gradually getting worse anyway." Certainly it could not be said that Grady was capable of doing hard work, if he thereby would run a substantial risk of increasing his disability or shortening his life. Wiener v. Mutual Life Ins. Co. of New York, 352 Mo. 673, 680, 179 S.W.2d 39, 43(8); Robinson v. United States, 2 Cir., 87 F.2d 343, 345 (2, 3). We still believe and hold that Dr. Palenske's testimony did not afford substantial evidence to support the Director's decision affirming the order *removing claimant* from the ADC rolls.

*As to the second complaint*: Arguing that "the word 'any' as used in the statute [Sec. 208.040(2)] is all comprehensive," the Department contended *in its brief* (upon which this case was submitted and determined) for a *literal, "according to the letter," interpretation* of the words "any gainful work" in the statutory requirement for physical or mental disability, namely, "a physical or mental defect, illness or disability * * * which prevents the parent from performing *any gainful work*." Sec. 208.040(2). With respect to this matter of statutory construction [see Webster's New International Dictionary (2nd Ed.), p. 572, for "the distinction between *construction* and *interpretation* * * * not well observed" in ordinary or legal usage], *all* that we *needed* to hold for proper disposition of this appeal, and *all* that we *intended* to hold in our opinion, was: (1) that *nothing short of a literal, "according to the letter," interpretation of "any gainful work" reasonably would have permitted the Director's findings and order on the admissible evidence before him*, (2) that *we were unwilling to accord such literal, "according to the letter," interpretation to those words*, and (3) that, therefore, the order under review was not supported by competent substantial evidence and was arbitrary and unreasonable, thus requiring the remanding of the cause to the Director for redetermination of the issues.

In the course of our discussion, we did refer to several recognized rules of statutory construction, among them the principle that statutes in pari materia should be construed together and harmonized, and we did point out that the literal construction of "any gainful work" for which the Department contended certainly would not harmonize with the language and intendment of Section 208.050. But we did *not* hold (as the Department charges) "that a person had to be employable or able-bodied to be denied ADC benefits," and we did *not* undertake to interpret or define either "able-bodied" or "employable" as those terms are used in Section 208.050 but left undefined therein, excepting insofar as the legislative intent with respect to "employable" may be gathered from the second sentence in subsection (3) thereof.

In the suggestions in support of its motion for rehearing or to transfer, the Department *now* informs us that " 'any gainful work' * * * has not received a literal interpretation as requiring a state of being bedfast or near-helplessness" but that

"*it has been construed as allowing the Division of Welfare to determine what kind of work is 'gainful' and encompassing the performance of services with reasonable regularity in some employment or self-employment.*" Having already considered and ruled the case as it was briefed and presented to us, we eschew *gratis dictum* concerning the Department's now-disclosed definition (if such it is intended to be) of "any gainful work." But perhaps it may not be amiss to indicate our hearty approval of the Department's present position that "any gainful work" should not receive a literal interpretation and its further suggestion that "*each case must be considered on all its own facts.*" For us to go further would be inappropriate and might be unwise.

The motion for rehearing or to transfer is overruled.

RUARK, P. J., and HOGAN, J., concur.